[No. A098568. First Dist., Div. Two. Sept. 9, 2003.]

KHAI HUYNH, Plaintiff and Respondent, v.
THUAN NGUYEN VU et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION.*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III. A. and III. C.

R. Stevens Condie for Defendants and Appellants.

Grout Law Firm and Daniel A. Grout, Law Offices of Matthew J. Webb and Matthew J. Webb for Plaintiff and Respondent.

OPINION

**RUVOLO, J.—**

I.

INTRODUCTION

This appeal follows a jury verdict for respondent Khai Huynh (Broker) in his action against Thuan Nguyen Vu (Seller) for a commission on Seller's sale of a parcel of commercial real property in Oakland (the Property) to Bill Phua (Buyer), and against Seller's husband, appellant Cuong Tat Vu (Husband), who was alleged to have acted as Seller's agent in connection with the transaction, and to have intentionally interfered with Seller's performance of the contract.

■ In the published portion of this opinion, we conclude that Husband was entitled to assert the common law manager's privilege in defense of Broker's tortious interference claim, since the evidence at trial could support the conclusion that the predominant motive for Husband's advice to Seller was to further Seller's interest and not the self-interest of Husband. Accordingly, the failure to instruct the jury on this defense was reversible error.

II.

FACTS[1]

Broker is a licensed real estate broker. In 1998, Buyer requested Broker's help in buying a commercial property in Oakland. Broker knew that the Property had been on the market in 1997, and that no buyer had been found before the listing expired. To find out whether the Property might still be available, Broker contacted Husband, with whom he had been acquainted for a few years, and whom he understood to be the owner of the Property.

In fact, as of 1998 Husband did not hold title to the Property. Husband and Seller had originally purchased the Property together in 1993, but Husband

---

[1]We are required to construe all of the facts and draw all reasonable inferences in the light most favorable to the judgment, as long as they are supported by substantial evidence in the record. (*Jensen v. BMW of North America, Inc.* (1995) 35 Cal.App.4th 112, 134 [41 Cal.Rptr.2d 295]; see also *Scott v. Pacific Gas & Electric Co.* (1995) 11 Cal.4th 454, 465 [46 Cal.Rptr.2d 427, 904 P.2d 834], disapproved on other grounds in *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 352, fn. 7 [100 Cal.Rptr.2d 352, 8 P.3d 1089].) Except as to the facts relating specifically to Husband's own role in the transaction and his personal liability, he does not contend that the judgment is not supported by substantial evidence. Accordingly, we state the background facts in the manner most favorable to Broker, resolving all evidentiary conflicts in his favor. (*Kotler v. Alma Lodge* (1998) 63 Cal.App.4th 1381, 1383, fn. 1 [74 Cal.Rptr.2d 721].) With respect to facts bearing directly on Husband's liability, we have summarized all of the evidence.

transferred his interest to Seller by interspousal grant deed almost immediately thereafter, and she remained the sole owner. Husband still participated actively in managing the Property, however. For example, Husband collected some of the rent; handled some of the maintenance and repairs; and signed at least one of the leases on his wife's behalf, with her authorization. One of the tenants testified that he dealt entirely with Husband in all matters concerning his lease and considered Husband to be his landlord, though he had not checked to see whether Husband actually had title to the Property.

When Broker contacted him, Husband indicated that he was still interested in selling, and that Broker should present an offer in writing. Broker mailed an informal letter of intent to Husband and Seller, and Husband responded by telephoning Broker and requesting that he prepare a formal offer. Broker then sent Husband, at the office address shared by Husband and Seller, a standard form real estate purchase offer dated September 25, 1998, signed by Buyer, offering to purchase the Property for $1.1 million. The offer also provided for Broker to receive a commission of 6 percent.

On November 3, 1998, after discussing the terms of the proposed transaction with Seller, Broker prepared a counteroffer and transmitted it to Buyer. By this time, Broker had learned that the true owner of the Property was Seller, not Husband. Husband did not have a power of attorney or any other written authority from Seller to act on her behalf in connection with the sale of the Property. Nonetheless, when Broker contacted Seller about the transaction, she often referred him to Husband, and Broker's communications with Seller generally went through Husband.

In the counteroffer, at Seller's request, Broker reduced his commission on the counteroffer to 3 percent. The counteroffer also increased the purchase price to $1.3 million, and added the following condition: "Escrow to close 90 days from Seller's acceptance. [¶] Contract extension, if any, after the expiration date have [sic] to be agreed by Seller in writing, or contract to be null & void at Seller [sic] choice." The 90-day deadline for close of escrow was added at Seller's request because of the rapidly changing nature of the real estate market at that time, but the provision that extensions must be agreed to by Seller in writing was supplied by Broker himself.

Buyer accepted the counteroffer on November 16, 1998. Broker opened an escrow the following day. The 90-day period was thus set to expire either in mid-February 1999, as Broker understood it, or on March 5, 1999, according to Seller's testimony.

During the period between mid-November 1998 and mid-February 1999, Broker unsuccessfully requested that Seller and Husband provide documentation about the income and expenses associated with the Property, which was

necessary in order for Buyer to obtain financing for the purchase. Husband is a medical doctor and, according to Broker, he and Seller frequently told Broker when he contacted them that they were too busy to respond to him. Seller explained at trial that she did not necessarily track the expenses on the property on a monthly basis, and did not normally compile complete expense information until it was needed to prepare her income tax returns.

Broker testified that he reminded Seller of the 90-day deadline for escrow to close, which Seller or Husband had requested, and indicated that it would be difficult for the transaction to close if the information Broker had requested was not forthcoming. Some documentation was provided, but it was incomplete, unverified, and otherwise inadequate.

Husband testified that he gave Broker all the leases he had, and that he explained to Broker the reason some were missing was that the current lender on the Property had requested them when Seller purchased it, and had not returned them all. Husband reported that Broker told him he was able to get the missing leases from the lender. One of the leases had expired. Husband tried to find the current version in his files, but was not able to find it, and ultimately a new lease had to be prepared for that particular tenant.

Broker also gave a set of tenant estoppel certificates[2] to Husband, who asked to review them before they were presented to the tenants; Husband promised to return them with the tenants' signatures a week later, but failed to do so. Broker prepared the estoppel certificates using the best information he had available, based on the few leases he had received from Husband together with information he had obtained by interviewing the tenants. Broker recognized that some of the information he used might be inaccurate, but expected that the tenants would correct any errors before signing the estoppel certificates.

In January 1999, Seller and Husband told Broker that copies of some of the leases on the Property were available from Seller's current lender, but even then Broker experienced difficulty obtaining them. Despite repeated requests, when the mid-February deadline arrived, Broker still had not received complete documentation.[3]

---

[2] As Broker explained at trial, a tenant estoppel certificate, also known as a tenancy statement, is a document signed by a tenant confirming the terms of the tenant's lease and the amount of any deposit, which gives the buyer of commercial real property assurance that the tenants will not contend, after the purchase, that their lease terms differ from the terms that the buyer understands to be in effect.

[3] Buyer testified that he was told informally as early as January 1999 that his loan would be approved, but a representative of the lender testified to the contrary. In any event, Buyer

On March 4, 1999,[4] Buyer closed escrow on his sale of a commercial property in San Francisco. Buyer was planning to shelter his capital gain on that sale from federal income tax liability by designating the Property he was purchasing from Seller as replacement property in a tax-free exchange under section 1031 of the Internal Revenue Code (section 1031). Because of the time limits applicable to section 1031 exchanges, Buyer informed Broker on March 4 that he was ready and eager to close escrow with Seller as soon as possible.[5]

As of March 4, neither Buyer nor Seller had affirmatively taken any action to declare the contract void or cancel the escrow, so Broker and Buyer both believed that the contract was still in effect even though, by their reckoning, the 90-day deadline to close escrow had passed. Accordingly, Broker called Seller and Husband's shared office, which was also the office for Husband's medical practice, and spoke with Husband about Buyer's desire to close. The trial testimony gave differing versions of the facts as to what happened next, but neither party contended that Seller or Husband indicated an intent to cancel the transaction at this time, even though the 90-day deadline had already lapsed and no extension had yet been requested or given.

According to Broker's trial testimony, Husband responded that he and Seller needed additional time before closing in order to coordinate the sale of the Property with a separate section 1031 exchange that Seller was planning. Husband therefore requested an extension, though he was not sure how many additional days would be required. At Husband's request, Broker prepared a document (the March 5 extension letter) for Seller's signature, indicating that "[S]eller request [*sic*] the close of escrow on the [P]roperty … be extended for [blank] days from today."

It is undisputed that Broker took the March 5 extension letter to Husband's office, and that Husband filled in the blank with the number "45"[6] to indicate the number of days the escrow was to be extended, and signed both his own

---

admitted at trial that the loan could not have been funded at that time, because some documentation was still missing, and the appraisal of the Property had not yet been completed.

[4] All further unspecified references to dates are to the year 1999.

[5] Buyer could have closed escrow on or before March 4, even if his loan had not yet been approved. He had other sources from which he could have advanced the entire purchase price, and he could still have made a section 1031 exchange even if he completed the purchase of the Property before selling his San Francisco property. However, Buyer did not inform Broker or Seller that he could close escrow without waiting for his loan to be approved.

[6] Buyer testified that although 45 days happened to be the time limit for him to designate a property for his own section 1031 exchange, the choice of this length for the extension did not originate with him; on the contrary, he was eager to close escrow as soon as possible. Buyer also testified that this was the first time he had heard that Seller was also planning to make a section 1031 exchange in connection with the sale of the Property.

and Seller's name. There was a sharp conflict in the testimony, however, regarding the circumstances under which Husband did so.

Broker testified that when Broker told Husband that Seller was supposed to sign the document, Husband said he could sign on her behalf, and added Seller's name after his own signature. Broker accepted Husband's representation that he had authority to sign the extension on Seller's behalf, and did not ask for or receive any written confirmation of that authority.

Husband's version of how he came to sign the March 5 extension letter was as follows: Broker called earlier that day to ask if Husband had checked with his accountant about a "designation" (presumably of section 1031 exchange property). Husband told Broker that he understood from his accountant that he had 45 days to "do the job," and that was the end of the conversation. Later that day, Broker unexpectedly showed up with the March 5 extension letter and asked Husband to fill in the number of days that his accountant had given him, i.e., 45, and to sign the document. Husband did so, but he was very busy at the time, and did not actually read the document until after he had signed it, when Broker asked him also to write his wife's (Seller's) name. At that point, Husband told Broker that they had never discussed an extension; that Broker would have to prepare another document for Seller to sign and should not use the one Husband had just signed; and that Husband had only signed the document by mistake.

It is not disputed that Buyer visited Husband's office on the evening of March 5 with Broker and Harry Han (Banker), who was both a representative of the lender[7] and a patient of Husband's. Once again, however, there was a conflict in the trial testimony concerning the specifics: how the visit came about, and what happened during the time the three men were at Husband's office.

Broker and Buyer's version was as follows. Buyer was willing to accept the extension, but he remained eager to close escrow as soon as possible, and the extension request had caused him to become concerned that there might be a problem closing the transaction. Accordingly, on that same day (March 5), after Husband signed the extension letter, Buyer requested the assistance of Banker, and went with him and Broker to Husband's office. While they were sitting in the waiting room, Husband came out and signaled to Banker to join him in an inner office. After 20 or 30 minutes, Banker emerged and told Buyer that there was no problem, and that Husband was "going to go through [with] it." Banker also told Broker and Buyer that Husband's

---

[7] Buyer's loan application was pending with the same bank from which Seller had obtained the existing financing.

willingness to close the transaction depended on Buyer's agreement to reduce, from $20,000 to $5,000, the amount of the credit he was requesting on account of the deteriorated air conditioning system at the Property. Buyer was willing to agree to this condition. Banker then said that Husband wanted Broker to prepare a new copy of the purchase contract, reflecting the amount of the air conditioning credit and updating the dates, and to give it to Banker.

Banker's account of the March 5 meeting at Husband's office was entirely different. He denied that he was there because Buyer had asked for his help in facilitating the transaction. He testified that he was already planning to visit Husband to obtain some medication, and that he simply ran into Buyer and Broker on the way. According to Banker, while Banker and Buyer were sitting in the waiting room, and before Banker went into Husband's back office, Broker met separately with Husband to obtain Husband's signature on the extension letter. Banker contended that he was only in Husband's office for two or three minutes, just long enough to get his medication, and Husband also denied discussing the transaction with Banker on March 5. Banker denied telling Broker anything about preparing a new purchase contract for the Property. He also denied telling him that Husband had said Seller was prepared to go through with the transaction. Banker acknowledged, however, that Husband did not appear agitated or distressed during their meeting, and did not assert that Broker had deceived him or that he had made a mistake.

After the March 5 meeting, Broker prepared a proposed revised contract reflecting the $5,000 credit for the air conditioning. Broker testified that he gave it to Banker on March 6, but Husband testified that he found it on the counter at his office later in the evening on March 5. Husband gave the proposed new contract to Seller, but it was never signed. Husband testified that because Broker had prepared the new contract, he thought that the mistake about his signing the March 5 extension letter had been taken care of, because the new contract would replace the extension letter.

Seller testified that, on March 7, Broker called her to ask why the new contract reflecting the $5,000 credit for the air conditioning had not been signed. She told him that she did not want to agree to sell for less than the original price, and also that she had not authorized Husband to sign her name or approve the extension of time.

On March 10, Buyer's attorney, Michael Kinane, sent Broker and Seller a letter indicating that Buyer had approved the 45-day extension of time for escrow to close, and giving April 19 as the extended deadline. Husband testified that he was surprised to receive this letter, because he had already told Broker that he had signed the March 5 extension letter by mistake, and

Seller had reiterated this on March 7. Seller and Husband admitted, however, that when they received Kinane's March 10 letter, neither of them contacted Kinane or Buyer to tell them that there had been a mistake, or that the deadline would not be extended.

By March 12, the lender had issued an official commitment letter for Buyer's loan, subject to conditions including a satisfactory appraisal. Seller still had not provided some of the documentation for the loan, including estoppel certificates, copies of leases, and an income and expense statement that was needed to complete the appraisal. Nonetheless, Buyer testified that the loan approval conditions could easily have been satisfied. At Buyer's request, because of his concern about the potential for a delay in closing the transaction due to Husband's request for additional time, a representative of the lender extended the expiration date of the loan commitment from March 31 to May 15.

On March 16, Husband wrote a letter to Broker stating that he had signed the March 5 extension letter by mistake. Husband testified at trial that he thought the problem about the mistake in signing the March 5 extension letter was taken care of at this point. The letter also stated that Broker had confirmed this in a conversation with Husband but, at trial, Broker denied that any such conversation had occurred.

After receiving Husband's March 16 letter, Broker tried unsuccessfully to contact Seller and Husband, but they did not return his calls. Buyer gave a copy of the letter to Kinane, and also asked to meet with Banker. On March 24, Banker told Buyer that Seller thought the property was worth $1.8 million rather than the $1.3 million purchase price specified in the contract, and that Seller and Husband wanted $1.5 million in order to close the escrow. Banker did not, however, indicate that Seller was taking the position that the contract had expired, and Seller and Husband did not tell Buyer they were taking that position until several weeks later.

On March 25, Kinane sent a letter to Seller and Husband regarding the transaction, with a copy to Verne Perry, who was Broker's attorney. Seller did not respond to this letter by contacting Kinane, Buyer, or Broker.

On April 12, Seller faxed Broker a letter telling him that his services were terminated, effective immediately, and that she had retained Mark Rubke, a real estate broker and attorney. Perry later forwarded Broker's file to Rubke at Seller's request. On the same date, Rubke also informed Kinane (Buyer's attorney) that he was now representing Seller in connection with the transaction.

After receiving Seller's April 12 letter, Broker talked to Buyer, who still wanted the transaction to close. In an effort to assist Buyer, between April 12

and April 19, Broker located copies of the estoppel certificates he had prepared a few months earlier and given to Husband, and took them to the Property to attempt to get the tenants to sign them.[8]

Some of the tenants declined, however. Broker testified that one of the tenants told him that the certificate Broker had prepared for that tenant contained inaccurate information concerning the amount of the rent, and that Husband had instructed the tenant not to sign it. The tenant testified that he had declined to sign the certificate because he did not know the person who was presenting it, and because when he called Husband for instructions, Husband told him not to sign it, without giving a reason. The tenant further testified that his refusal to sign the certificate was due to Husband's instructions, and not due to the inaccuracy in the document.[9]

Husband, on the other hand, testified that when the tenant called, Seller talked to him first, and explained that the tenant should have the inaccurate information corrected before he signed the certificate, but then Seller gave Husband the telephone because she was afraid she had not explained herself adequately due to her lack of confidence in her ability to communicate in English. Seller's testimony about her own conversation with tenant was essentially consistent with Husband's, but she did not mention any subsequent conversation between Husband and the tenant. Husband denied ever telling any other tenant not to sign documents submitted to them by Broker in connection with the transaction.

On April 15, Kinane and Rubke spoke by telephone, and Kinane emphasized to Rubke that Buyer still expected the escrow to close on April 19. Rubke responded that he would have to consult with his clients, and did not indicate that they intended to cancel the transaction. Rubke and Kinane did not communicate further between April 15 and April 19.

Buyer continued to make efforts to close the transaction, because April 19 was the deadline by which he had to make a final designation of the replacement property for his section 1031 exchange. Even after April 19 came and went without escrow having closed, Buyer continued to believe that the contract remained in effect, and still wanted to close escrow. On April 20, Rubke faxed Kinane a letter intended to convey that Seller had not yet decided what she intended to do about closing escrow.

---

[8] Rubke later wrote to Kinane stating that Broker and Buyer did not have permission to contact the tenants directly, because the tenants had complained to Seller about Broker's contacts with them.

[9] On May 15, when Husband brought the tenant another estoppel certificate, Husband told the tenant to sign it, and he did.

Early in the morning on April 22, Kinane faxed Rubke a letter stating that the escrow company had the closing documents ready, and that Buyer intended to close the transaction that day. Rubke responded by return fax later the same day, stating that as a practical matter it would not be possible for him to review the closing documents, discuss them with his client, and close escrow that day. Nonetheless, Buyer signed the escrow documents on April 22. Broker testified that some of the documentation Buyer had requested from Seller and Husband still had not been provided, but at this point Buyer was prepared to close without it.

On April 23, Seller received a fax from the title company telling her that the escrow documents were ready to be signed. She gave it to Rubke, but did not sign the documents, because her position was that the sale contract had already expired.

On April 27, Rubke faxed Kinane another letter saying that Seller had decided to exercise her right to cancel the agreement, based on the provision in her November 3, 1998 counteroffer requiring that escrow close within 90 days. Although Kinane had already become concerned that the transaction would not close, this was the first time Seller had formally communicated her intent to cancel the agreement to Buyer or Kinane.

By April 27, the deadline for Buyer to designate a different property for his section 1031 exchange had passed, and he was obligated to consummate the purchase of the Property in order to avoid capital gains taxes on the property he had sold in San Francisco. He therefore approached Banker for help in getting Seller to reopen the transaction.

Seller told Banker she was willing to sell the property to Buyer for $1.5 million. The parties ultimately agreed on a price of $1.425 million. On May 5, Seller instructed Rubke to prepare another contract for the sale of the property to Buyer.

Banker presented the new terms to Buyer on a "take it or leave it" basis, and Buyer reluctantly accepted. In the new contract, Buyer agreed to pay a higher purchase price ($1.425 million rather than $1.3 million), and there was no provision for a commission to Broker. Buyer also signed a letter, dated May 8, saying that he was no longer represented by any attorney or broker in connection with the transaction. The contract was signed on May 11, the missing estoppel certificates and other information were supplied, and escrow closed on May 24.

Subsequently, Broker sued Seller for his commission on the sale, and also sued Husband for intentional interference with Seller's performance of the

contract. The jury awarded Broker $42,750 as against Seller, and $15,000 compensatory damages plus $173,250 in punitive damages as against Husband. This appeal followed.[10]

## III.

## DISCUSSION

Appellant Husband argues on appeal that even if he interfered with Seller's performance of her contract with Broker, his actions were privileged under the manager's privilege (also known as the agent's privilege).[11] (See generally *Halvorsen v. Aramark Uniform Services, Inc.* (1998) 65 Cal.App.4th 1383, 1391–1396 [77 Cal.Rptr.2d 383] (*Halvorsen*).) He contends that the trial court erred in failing to grant his motions for nonsuit and for judgment notwithstanding the verdict on the basis of that privilege. Alternatively, he contends that the jury should have been instructed to consider his manager's privilege defense. As noted, we agree with the latter contention, and therefore reverse.

### A.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### B.

#### Scope and Applicability of Manager's Privilege

One of the early modern cases on the manager's privilege described it as follows: "The privilege to induce an otherwise apparently tortious breach of contract is extended by law to further certain social interests deemed of sufficient importance to merit protection from liability. Thus, a manager or agent may, with impersonal or disinterested motive, properly endeavor to protect the interests of his principal by counseling the breach of a contract with a third party which he reasonably believes to be harmful to his employer's best interests. [Citation.]" (*Olivet v. Frischling* (1980) 104 Cal.App.3d 831, 840–841 [164 Cal.Rptr. 87], fn. omitted, disapproved on

---

[10] Seller also cross-complained against both Broker and Buyer, and Buyer in turn cross-complained against Seller and Husband. Judgment was entered against Seller on her cross-complaint against Broker and Buyer, and for Buyer on his cross-complaint against Seller and Husband. During the pendency of the ensuing appeals, the parties settled all other aspects of the case, leaving only Husband's appeal for adjudication.

[11] The privilege has been referred to interchangeably as the "agent's privilege" as well as the "manager's privilege." For uniformity's sake we will refer to it as the manager's privilege.

*See footnote, *ante*, page 1183.

other grounds in *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 510 [28 Cal.Rptr.2d 475, 869 P.2d 454]; accord, *Aalgaard v. Merchants Nat. Bank, Inc.* (1990) 224 Cal.App.3d 674, 684 [274 Cal.Rptr. 81].)

We note initially that the privilege is most often applied to bar actions against managers of a business entity that charge the managers with inducing the entity to breach a contract. The rationale for the privilege, however, as articulated in *Olivet v. Frischling*, and as discussed below, applies with equal force to an equivalent action against a manager or agent acting on behalf of a natural person. We are not persuaded by respondent Broker's somewhat pallid argument that the privilege should be limited to instances where the principal is a business entity, nor do we discern any public policy reason to limit its reach in this manner. Furthermore, Broker has not cited us to any case law drawing a distinction between the two situations, and our research has revealed none.[16] Accordingly, we see no reason to limit the application of the manager's privilege solely to the managers of business entities, and we therefore conclude that Husband is not precluded from asserting the manager's privilege because his principal, his spouse, is not a business.

The scope of the manager's privilege, as developed under California's common law since *Olivet v. Frischling* was decided, is neither clear nor consistent. (*Halvorsen v. Aramark Uniform Services, Inc., supra,* 65 Cal.App.4th at pp. 1391, 1393.) Indeed, in *Aalgaard v. Merchants Nat. Bank, Inc., supra,* 224 Cal.App.3d 674 (*Aalgaard*), the court commented that the question of whether the privilege is absolute or qualified is "somewhat muddled in California law," resulting in a "knot of authority" on the issue. (*Id.* at pp. 684–685.) As the court explained in *Halvorsen,* "There are three formulations of the manager's privilege: (1) absolute, (2) mixed motive, and (3) predominant motive." (*Halvorsen, supra,* 65 Cal.App.4th at p. 1391.)

If the privilege is absolute, it is based solely on the manager's status as the manager of the breaching party, without regard to the manager's motives or state of mind. The "mixed motive" formulation applies the privilege as long as the manager is motivated, at least in part, by a desire to benefit the principal. The "predominant motive" formulation is the most restrictive, granting a manager the privilege of interfering with a principal's contract only when the manager's predominant motive is to serve the interest of the principal. (See generally *Aalgaard, supra,* 224 Cal.App.3d at pp. 684–686.)

---

[16] In discussing the circumstances under which an actor responsible for the welfare of another—including an agent with a duty to his or her principal—may lawfully interfere with the other's contractual relationships, the comments to the Restatement Second of Torts, section 770, include several examples in which the party being induced to breach a contract is a natural person.

In the absence of a clear declaration in California case law, the Ninth Circuit in *Los Angeles Airways, Inc. v. Davis* (9th Cir. 1982) 687 F.2d 321, was forced to prognosticate which test would be adopted by the California Supreme Court. It concluded that our high court would most probably follow the mixed motive test. In affirming an order granting summary judgment to an attorney/business advisor who was alleged to have induced a breach of contract by the corporation for which he worked, the court rejected the argument that the privilege was inapplicable merely because the manager was alleged to have been motivated in part by a desire to elevate his own standing in the eyes of the corporation's principal. The court distinguished *Olivet v. Frischling, supra,* 104 Cal.App.3d 831, and reasoned that "where, as here, an advisor is motivated *in part* by a desire to benefit his principal, his conduct in inducing a breach of contract should be privileged. The privilege is designed to further certain societal interests by fostering uninhibited advice by [managers] to their principals. The goal of the privilege is promoted by protecting advice that is motivated, *even in part,* by a good faith intent to benefit the principal's interest." (*Los Angeles Airways, Inc., supra,* 687 F.2d at p. 328, italics added.)

The opinion went on to embrace a rule acknowledging the practical reality that few business decisions are made with complete altruism: "We believe that advice by an agent to a principal is rarely, if ever, motivated purely by a desire to benefit only the principal. An agent naturally hopes that by providing beneficial advice to his principal, the agent will benefit indirectly by gaining the further trust and confidence of his principal. If the protection of the privilege were denied every time that an advisor acted with such mixed motive, the privilege would be greatly diminished and the societal interests it was designed to promote would be frustrated. We do not believe that the California Supreme Court would so eviscerate the privilege, and we decline to do so." (*Los Angeles Airways, Inc. v. Davis, supra,* 687 F.2d at p. 328.)

Thereafter, in the unique context of employment advice to higher management, one court has concluded the manager's privilege should be absolute as to any suit by a terminated at-will employee against the members of the management team. (*Halvorsen, supra,* 65 Cal.App.4th at p. 1395.) The *Halvorsen* court opted for an absolute privilege based on the primacy of protecting the employer-manager relationship. Its decision grew out of a concern that commercial success could best be promoted by allowing the employer's "relationship and communication with management [to] be open and specific." Thus, the court concluded that any disruption of the relationship between an enterprise and its managers should be left up to the Legislature, where "the public policy implications of such interference can be openly debated in a democratic forum." (*Ibid.*)

Several earlier cases applying California law in the employment termination context are consistent with *Halvorsen*'s holding. (See *Shoemaker v. Myers* (1990) 52 Cal.3d 1, 24–25 [276 Cal.Rptr. 303, 801 P.2d 1054] [affirming trial court's order sustaining demurrer to cause of action against managers of public entity employer for inducing breach of plaintiff's employment contract]; *McCabe v. General Foods Corp.* (9th Cir.1987) 811 F.2d 1336, 1339 [suit against corporate managers for inducing corporation to discharge at-will employee failed to state cause of action despite allegation that managers were motivated in part by ill will].) *Aalgaard* declined to reach the issue, because the plaintiff had presented no evidence whatsoever that the defendant managers had acted out of any motive other than the employer's interests, so the privilege clearly applied even if it was qualified. (*Aalgaard, supra,* 224 Cal.App.3d at pp. 685–686.)

But, even in the area of wrongful termination, there are several cases holding that the privilege is less than absolute. For example, in *Graw v. Los Angeles County Metropolitan Transport.* (C.D. Cal. 1999) 52 F.Supp.2d 1152, the court expressly declined to follow *Halvorsen* in applying an absolute privilege to employment termination cases under California law. The plaintiff in *Graw* alleged that the actions of his supervisors in terminating his employment were outside the course and scope of their authority, and were undertaken for their personal benefit. The court denied the defendants' motion for summary judgment based on the manager's privilege, reasoning that "[i]f the manager's acts were not done to benefit the company, the manager should not be deemed an interested party and should not enjoy the privilege to interfere with the economic relationship between the employee and the employer." (*Id.* at p. 1155.)

The result reached in *Graw* was in accord with two pre-*Halvorsen* employment termination cases, *Kozlowsky v. Westminster Nat. Bank* (1970) 6 Cal.App.3d 593 [86 Cal.Rptr. 52], and *Wanland v. Los Gatos Lodge, Inc.* (1991) 230 Cal.App.3d 1507 [281 Cal.Rptr. 890]. In *Kozlowsky*, the complaint alleged that the majority shareholder of the plaintiff's corporate employer acted maliciously and without justification in inducing the corporation to terminate the plaintiff's employment. The court reversed an order sustaining a demurrer, holding that a majority shareholder in a corporation is not privileged as a matter of law to induce the corporation to breach a contract, so the cause of action was viable based on the allegations of malice and lack of justification. (*Kozlowsky, supra,* 6 Cal.App.3d at pp. 599–600.) In *Wanland*, the court upheld the dismissal of the plaintiff's claims against the owner and manager of her corporate employer. It held that the owner's and manager's privilege to interfere with the plaintiff's employment contract was only qualified, but found that there was no evidence in the trial record tending to negate the existence of the privilege. (*Wanland, supra,* 230 Cal.App.3d at p. 1522.)

Thus, the case law on the scope of the manager's privilege is less than unanimous even in the at-will employment context. Nevertheless, outside the at-will employment arena the privilege is most often applied as a qualified one. However, there is no consensus regarding whether this qualified manager's privilege requires that the manager's motive to benefit the principal *predominate* over any personal motive (the predominant motive test), or merely require a showing that the manager is motivated in part, if not primarily, by a desire to benefit the principal (the mixed motive test).

In our view, when a manager stood to reap a tangible personal benefit from the principal's breach of contract, so that it is at least reasonably possible that the manager acted out of self-interest rather than in the interest of the principal, the manager should not enjoy the protection of the manager's privilege unless the trier of fact concludes that the manager's *predominant* motive was to benefit the principal. Thus, in a case such as the instant one, where the manager had a material, albeit indirect, personal financial interest in the transaction,[17] we are of the opinion that the predominant motive test should be applied.

Our conclusion that the predominant motive test should be applied when a defense of manager's privilege is asserted in response to most forms of commercial tort claims rests on several factors. First, in practical terms, adopting the mixed motive test would be tantamount to proclaiming absolute immunity. Rare indeed would be the case where the principal's interest could not be advanced at least to some degree by the manager's advice. If not, how else would the principal become convinced to breach its contract in the first place? Despite the weight of evidence which may exist as to the real motive and interest of the manager, if the manager can enjoy immunity from tort liability merely by proffering some plausible reason the principal might benefit from a breach, few cases will ever reach a civil jury, let alone result in a verdict against the manager.

Second, the predominant motive test also best meets the economic considerations applicable to the tort of interference with contract. Generally, the right of a contracting party to breach a contract and pay damages (nominally referred to as "expectation damages"[18]), instead of being required by law to perform, has driven legal economists to extol the principle of efficient breach of contract as " '[o]ne of the most enlightening insights of law and

---

[17] The Property was originally purchased with funds belonging to both Husband and Seller. Moreover, as is clear from our recitation of the facts, *ante*, Seller and Husband both expended time and effort during the marriage in managing it. Accordingly, even though Husband did not hold title to the Property, he presumably retained some beneficial interest in the proceeds from its sale.

[18] See Cooter & Ulen, Law & Economics (3d ed. 2000), page 226.

economics.' " (McChesney, *Tortious Interference with Contract Versus "Efficient" Breach: Theory and Empirical Evidence* (1999) 28 J. Legal Stud. 131, 132, fn. omitted, quoting Cooter & Ulen, Law and Economics (1988), p. 290.) Essentially, where it is worth more to the promisor to breach rather than to perform a contract, it is more efficient for the law to allow the promisor to breach the contract and to pay the promisee damages based on the benefit the promisee expected to gain by the completed contract. (*Ibid.*) Providing a manager with immunity where the advice to breach is given predominantly to benefit the principal is consistent with the efficient breach theory: The principal/promisor is thus enabled to obtain and rely on the manager's advice in making a judgment whether its interests are best served by performance, or by breach and the payment of damages to the promisee.

However, if the manager's privilege is absolute, or subject only to the mixed motive test, the privilege would allow the manager to retain the manager's own benefit from the principal's breach while escaping any allocated share of liability. Where the economic benefit to the manager occasioned by the principal's breach of contract exceeds any incremental benefit to the principal, then the privilege would permit the manager to shift the manager's own burden in having caused the promisee's damages improperly to the principal. In addition, if the principal is unable to pay expectation damages to the promisee (for example, if the principal becomes bankrupt), then the inefficiency of the principal's breach is compounded by the shortfall in damages recoverable by the promisee who would be precluded from recovering an aliquot share against the manager.

This example reveals an unnecessary inequity created by not applying the predominant motive test to the manager's privilege under a fundamental economic theory of law. It is also not simply a hypothetical illustration. (See Comment, *Boxing Basinger: Oral Contracts and the Manager's Privilege on the Ropes in Hollywood* (2002) 9 UCLA Ent. L.Rev. 285, 287–291; Note, *Main Line v. Basinger and the Mixed Motive Manager: Reexamining the Agent's Privilege to Induce Breach of Contract* (1995) 46 Hastings L.J. 609, 626.)

The final factor in our decision to adopt a predominant motive test, while not compelling, is that this result is in accord with decisions of the highest courts of several other states. (See, e.g., *Geolar, Inc. v. Gilbert/Commonwealth* (Alas. 1994) 874 P.2d 937, 940–941; *Jones v. Lake Park Care Center, Inc.* (Iowa 1997) 569 N.W.2d 369, 376–378; *Nordling v. Northern States Power Co.* (Minn. 1991) 478 N.W.2d 498, 507; *Trau-Med of America, Inc. v. Allstate Ins. Co.* (Tenn. 2002) 71 S.W.3d 691, 701–702 & fn. 5; see also Note, *supra,* 46 Hastings L.J. at pp. 629, 632–637; but see *Welch v. Bancorp Management Advisors, Inc.* (Or. 1983) 296 Ore. 208 [675

P.2d 172, 178–179], mod. on other grounds, 296 Ore. 713 [679 P.2d 866] [adopting mixed motive test].)

In reviewing the record in this case under the predominant motive test, it appears that Husband might well have been able to establish that his conduct here was privileged, even under this more restrictive test. There was ample evidence from which the jury could have concluded that, in interfering with the contract, Husband's predominant motive was to serve Seller's interests, and that he acted in accordance with her wishes. Indeed, there was *no* evidence that Husband acted from any motive or interest of his own that conflicted in any way with Seller's interests or wishes. (Cf. *Aalgaard, supra,* 224 Cal.App.3d at pp. 685–686 [summary judgment properly granted for defendants on claim for interference with plaintiff's employment contract, where there was no evidence that employer's managers personally benefited from plaintiff's termination, or that they acted out of self-interest].) The most that can be said is that Husband may have been motivated to some extent by a desire to enhance whatever community property interest he had in the proceeds from the transaction. ■ But that motive was fully congruent with the interests of Seller as the other member of the marital community, and even under the predominant motive test, a manager's desire to advance his or her personal interests as an indirect and secondary result of benefiting the principal should not vitiate the privilege. (Cf. *Los Angeles Airways, Inc. v. Davis, supra,* 687 F.2d at pp. 326–328 [same, under mixed motive test].)

Thus, even applying the predominant motive test, it is reasonably probable that Husband would have been exonerated under the manager's privilege, if the jury had been instructed to consider it. Because the trial court's refusal to give the requested instruction prevented Husband from presenting a potentially meritorious defense to the jury, he was unquestionably prejudiced by the error. (See *GAB Business Services, Inc. v. Lindsey & Newsom Claim Services, Inc.* (2000) 83 Cal.App.4th 409, 423–425 [99 Cal.Rptr.2d 665]; *Gutierrez v. Cassiar Mining Corp.* (1998) 64 Cal.App.4th 148, 158–160 [75 Cal.Rptr.2d 132].) The judgment against Husband must therefore be reversed.

### C.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### IV.

### DISPOSITION

The judgment in favor of Broker on his cause of action against Husband for intentional interference with contract is reversed. As the parties have

---

[*]See footnote, *ante,* page 1183.

settled the remaining aspects of the case, this opinion does not address or affect any other portion of the judgment.

Kline, P. J., and Haerle, J., concurred.