Filed 2/19/14

*CERTIFIED FOR PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
SECOND APPELLATE DISTRICT
DIVISION THREE

| | |
|---|---|
| CROWN IMPORTS, LLC, | B248624 |
| Petitioner, | |
| v. | (Los Angeles County Super. Ct. No. BC460055) |
| THE SUPERIOR COURT OF LOS ANGELES COUNTY, | |
| Respondent; | |
| CLASSIC DISTRIBUTING & BEVERAGE GROUP, INC., | |
| Real Party in Interest. | |
| STANLEY ROWLEY, | B248627 |
| Petitioner, | |
| v. | |
| THE SUPERIOR COURT OF LOS ANGELES COUNTY, | |
| Respondent; | |
| CLASSIC DISTRIBUTING & BEVERAGE GROUP, INC., | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS in mandate.  Mel Recana, Judge.  Petition granted and remanded.

McDermott, Will & Emery, Robert A. Weiner, Derek J. Meyer and Kristen C. Klanow; Ropers, Majeski, Kohn & Bentley, Susan H. Handelman and Terry Anastassiou for Petitioners.

No appearance for Respondent.

Bingham McCutchen, Michael A. Sherman, Nicolette L. Young and Christopher M. O'Connor for Real Party in Interest.

—————————————————

Crown Imports, LLC (Crown) is the national importer of Corona beer and other beer brands. Two of its local distributors are Haralambos Beverage Company (HBC) and Classic Distributing & Beverage Group (Classic). Classic and HBC allegedly entered into an oral agreement for HBC to sell its Crown distributorship to Classic. Crown, which had the contractual right to do so, disapproved the sale to Classic. HBC ultimately sold the distributorship to another entity, and has no dispute with Crown. Classic, however, as the disappointed buyer of HBC's Crown distributorship, brought the instant action against Crown for intentional and negligent interference with prospective economic advantage. Crown moved for summary judgment. Its motion was denied and Crown now seeks relief by petition for writ of mandate.[1] We issued an order to show cause and now grant the petition.

### FACTUAL AND PROCEDURAL BACKGROUND

1. *Allegations of the Complaint*

The operative complaint is the second amended complaint.[2] Although the complaint is concerned with a failure to approve Classic's purchase of the HBC Crown

---

[1] Crown's employee, Stanley Rowley, who was also sued by Classic, brought an identical petition. As their arguments are the same, references to Crown include Rowley, unless the context requires otherwise.

[2] The second amended complaint was filed, by stipulation, after Crown's motion for summary judgment had been filed. It appears to have been drafted prior to that date.

3

distributorship in 2010, Classic's allegations date back to Classic's attempt to purchase the HBC Crown distributorship in 2008. In August 2008, Classic and HBC had reached an agreement for Classic to purchase HBC's Crown distributorship. At that time, Crown denied approval, stating as reasons Classic's own performance as a Crown distributor. Classic alleges that, at this time, Crown secretly preferred another buyer for HBC's Crown distributorship, and therefore began "orchestrating the sale" from HBC to its preferred distributor.

By 2010, Classic's performance had improved by any objective measure,[3] and it again sought to purchase HBC's Crown distributorship. It is not entirely clear whether (1) HBC *agreed* to sell its Crown distributorship to Classic, on specific terms, conditioned on Crown's approval; or (2) whether HBC agreed to *enter into a contract* to sell its Crown distributorship to Classic, under the same terms as the 2008 agreement, conditioned on Crown's approval. Classic alleged both of these circumstances in the alternative.[4]

In any event, Rowley, who was responsible for Crown's Southern California division, met with Classic's representatives in June 2010, in order to discuss Classic's

[3]  The parties repeatedly refer to the "Kahuna Cup," an award for top distributorships, which Classic won for its performance in 2008 and 2009.

[4]  The evidence would subsequently reveal a third possibility, which was that HBC told Classic that it was not even interested in discussing an agreement with Classic unless and until Classic obtained preapproval from Crown, given Crown's prior disapproval of Classic. Crown, obviously, prefers this version of the facts, because, if it is true, then Classic would not be able to show a sufficient probability of future economic benefit from the *possible* HBC sale in order to pursue a cause of action for interference with prospective economic advantage. There appears to be a triable issue of fact on this issue.

possible acquisition of HBC's Crown distributorship. Rowley, on behalf of Crown, denied approval. According to the allegations of the complaint, Crown denied approval based on pretextual factors, and simply refused to consent because Classic was not Crown's preferred distributor.[5]

Ultimately, HBC sold its distributorship to Anheuser-Busch Sales Pomona (AB Pomona) in December 2010. Classic alleged that this sale was orchestrated by Crown. Classic does not allege, and concedes that it had no evidence, that the sale from HBC to AB Pomona was for less than the fair market value of HBC's Crown distributorship.

Classic alleged causes of action for intentional interference with prospective economic advantage and negligent interference with prospective economic advantage. As the torts of interference with prospective economic advantage require the act of interference to have been "independently wrongful," Classic specifically identified two statutes which it contends Crown violated, Business and Professions Code sections 25000.9[6] and 23300.[7] In connection with its cause of action for intentional interference, Classic sought punitive damages.

---

[5]    Crown allegedly preferred a distributor affiliated with Anheuser-Busch, on the basis that Anheuser-Busch was a parent company of Crown's 50% owner. In the alternative, Classic alleged that Crown preferred a different distributor because Crown had a secret plan to consolidate its distributorships.

[6]    Business and Professions Code section 25000.9 provides, "(a) Any beer manufacturer who unreasonably withholds consent or unreasonably denies approval of a sale, transfer, or assignment of any ownership interest in a beer wholesaler's business with respect to that manufacturer's brand or brands, shall be liable in damages to the beer wholesaler. Recoverable damages under this section shall not exceed the

2.    *Motion for Summary Judgment*

Crown sought summary judgment on several bases, including that Classic could not prove that its alleged interference constituted an "independently wrongful act." Crown argued that Classic could not allege a wrongful act based on Business and Professions Code section 25000.9, as that statute was meant to protect disappointed *sellers*, not disappointed buyers. Crown also argued that Classic could not allege a wrongful act based on Business and Professions Code section 23300 because Crown did not perform any unauthorized act.[8]

---

compensatory damages sustained by the wholesaler and the wholesaler's costs of suit. The fair market value of the beer wholesaler's business shall include, but is not limited to, its goodwill, if any. [¶] (b) If a beer wholesaler has been paid a consideration by a successor wholesaler for the sale, transfer, or assignment of the beer wholesaler's interest in the sale or distribution of the affected brand or brands, the beer manufacturer shall be liable only for compensatory damages in an amount reflecting the difference in the amount already paid to the beer wholesaler, and the fair market value of the beer wholesaler's business with respect to the affected brand or brands. [¶] (c) For purposes of this section, 'beer manufacturer' includes any holder of a beer manufacturer's license, any holder of an out-of-state beer manufacturer's certificate, or any holder of a beer and wine importer's general license." There is no dispute that, as a national importer, Crown is a "beer manufacturer" within the meaning of this statute.

[7]    Business and Professions Code section 23300 provides that "[n]o person shall exercise the privilege or perform any act which a licensee may exercise or perform under the authority of a license unless the person is authorized to do so by a license issued pursuant to this division." Classic alleges that Crown violated this section's "prohibition on the attempted and actual exercise of control over an independently licensed wholesaler's right to divest ownership interests with respect to its brands without the unreasonable withholding of consent, control or other unlawful interference by a supplier . . . that does not own or is not named on the wholesaler's license."

[8]    Crown's motion also challenged the factual allegations of Classic's complaint. Crown submitted evidence supporting its position that HBC had not agreed to sell to Classic in 2010 (so there was nothing for Crown to disapprove) and, in any event, Crown did not reject Classic as a possible purchaser of HBC's Crown distributorship in

6

### 3. *Classic's Opposition*

In opposition to Crown's summary judgment motion, Classic disputed most of Crown's purportedly undisputed facts, and attempted to establish the existence of a secret plan to prevent Classic from acquiring HBC's Crown distributorship dating back to 2008 – even though Classic's complaint relates *only* to Crown's denial of approval in 2010.

As to the legal issues, Classic argued that even though it could not independently bring a cause of action against Crown for violating Business and Professions Code section 25000.9, it could rely on the statutory violation as an independently wrongful act to establish a basis for its causes of action for interference with prospective economic advantage. As to Business and Professions Code section 23300, Classic relied on a February 2010 Attorney General (AG) "Advisory to CA Beer Manufacturers and Importers" which identified certain provisions in distributorship agreements which the AG believed to constitute unlawful exercises of control by manufacturers over independently licensed wholesalers. Those provisions included, "Manufacturers having the right to control or approve a wholesaler's acquisitions or divestitures of businesses or product lines, or a change in control of a wholesaler or a wholesaler's business, in either case including, but not limited to, a manufacturer's right of first refusal to purchase or right to appoint a designee purchaser." Additionally, for the first time, Classic also argued that Crown's interference was independently wrongful as the

_____

2010. These contentions would be disputed by Classic. Our disposition of the instant writ petition does not require resolution of the factual issues. We assume Classic can establish the allegations in its complaint.

7

culmination of an act of fraudulent concealment, specifically, Crown's concealment of the real reasons why Classic had not been approved to purchase HBC's Crown distributorship in 2008.[9]

4.    *Hearing and Ruling*

The trial court, after a hearing, denied the motion for summary judgment. The court concluded that Classic could pursue its argument that the interference with its proposed agreement with Crown was independently wrongful under Business and Professions Code section 25000.9 even though that statute gives a remedy only to a disappointed seller. The trial court relied on authority holding that the fact that the plaintiff is an indirect victim of the wrongful act does not preclude a cause of action for interference with the plaintiff's prospective economic advantage. The court also concluded that triable issues of fact existed as to whether, among other things, there was actually an agreement between Classic and HBC in 2010, and Crown unreasonably denied approval.

5.    *Writ Petitions*

Both Crown and Rowley filed petitions for writ of mandate. We consolidated the petitions and issued an order to show cause.

### *CONTENTIONS OF THE PARTIES*

Crown argues that it was entitled to summary judgment on the ground that Classic cannot establish that Crown's alleged interference with the 2010 alleged

---

[9]    Classic argued that the fraudulent concealment was "first committed" when Crown told it, in 2008, that Crown would "leave the door open" for Classic to be reconsidered if its performance improved.

agreement between HBC and Classic was "independently wrongful" on any of the grounds relied upon by Classic: (1) application of Business and Professions Code section 25000.9; application of Business and Professions Code section 23300; and (3) Crown's alleged fraudulent concealment. Classic disagrees.

## DISCUSSION

1. *Standard of Review*

" 'A defendant is entitled to summary judgment if the record establishes as a matter of law that none of the plaintiff's asserted causes of action can prevail.' (*Molko v. Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107.) The pleadings define the issues to be considered on a motion for summary judgment. (*Sadlier v. Superior Court* (1986) 184 Cal.App.3d 1050, 1055.) As to each claim as framed by the complaint, the defendant must present facts to negate an essential element or to establish a defense. Only then will the burden shift to the plaintiff to demonstrate the existence of a triable, material issue of fact. (*AARTS Productions, Inc. v. Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064-1065.)" (*Ferrari v. Grand Canyon Dories* (1995) 32 Cal.App.4th 248, 252.) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.) We review orders granting or denying a summary judgment motion de novo. (*FSR Brokerage, Inc. v. Superior Court* (1995) 35 Cal.App.4th 69, 72; *Union Bank v. Superior Court* (1995) 31 Cal.App.4th 573, 579.) We exercise "an independent assessment of the correctness

9

of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law." (*Iverson v. Muroc Unified School Dist.* (1995) 32 Cal.App.4th 218, 222.)

In this case, we are concerned largely with legal issues. As such, we assume the disputed factual issues are resolved in favor of Classic.

### 2. *Interference with Prospective Economic Advantage*[10]

"The elements of a claim of interference with economic advantage and prospective economic advantage are: ' " '(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional [or negligent] acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant.' [Citations.]" [Citation.]' [Citation.]" (*Winchester Mystery House, LLC v. Global Asylum, Inc.* (2012) 210 Cal.App.4th 579, 596.)

An additional element is required. "The tort of intentional interference with prospective economic advantage is not intended to punish individuals or commercial entities for their choice of commercial relationships or their pursuit of commercial

---

[10] The difference between intentional interference and negligent interference with prospective economic advantage relates to the defendant's intent. In the instant writ proceeding, Crown's intent is not relevant to our analysis of the dispositive issues; Crown's summary judgment motion was directed to *other* elements of Classic's interference with prospective economic advantage causes of action. As such, we consider those causes of action together.

objectives, unless their interference amounts to independently actionable conduct. [Citation.]" (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1158-1159.) As such, courts require an additional element, that the alleged interference must have been wrongful by some measure beyond the fact of the interference itself. (*Della Penna v. Toyota Motor Sales, U.S.A., Inc.* (1995) 11 Cal.4th 376, 392-393.) For an act to be sufficiently independently wrongful, it must be "unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." (*Korea Supply Co. v. Lockheed Martin Corp., supra,* 29 Cal.4th at p. 1159.)

The independently wrongful act must be the act of interference itself, but such act must *itself* be independently wrongful. That is, "[a] plaintiff need not allege the interference and a second act independent of the interference. Instead, a plaintiff must plead and prove that the conduct alleged to constitute the interference was independently wrongful, i.e., unlawful for reasons other than that it interfered with a prospective economic advantage. [Citations.]" (*Stevenson Real Estate Services, Inc. v. CB Richard Ellis Real Estate Services, Inc.* (2006) 138 Cal.App.4th 1215, 1224.)

It is the plaintiff's burden to plead and prove that the defendant's conduct is independently wrongful in order to recover. The fact that the defendant's conduct was independently wrongful is an element of the cause of action itself. (*Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Village Square Venture Partners* (1997) 52 Cal.App.4th 867, 881.)

11

The question has arisen as to whether, in order to be actionable as interference with prospective economic advantage, the interfering act must be independently wrongful *as to the plaintiff.* It need not be. There is "no sound reason for requiring that a defendant's wrongful actions must be directed towards the plaintiff seeking to recover for this tort. The interfering party is liable to the interfered-with party [even] 'when the independently tortious means the interfering party uses are independently tortious *only as to a third party.*' "[11] (*Korea Supply Co. v. Lockheed Martin Corp., supra,* 29 Cal.4th at p. 1163.)

With this background in the law, we now turn to the three bases on which Classic argues that Crown's refusal to approve it as a buyer of HBC's Crown distributorship constituted an independently wrongful act sufficient to support its claim for interference with prospective economic advantage: (1) Business and Professions Code section 25000.9; (2) Business and Professions Code section 23300; and (3) fraudulent concealment.

3. *Business and Professions Code Section 25000.9*

As discussed above (see footnote 6, *ante*), Business and Professions Code section 25000.9 provides, "Any beer manufacturer who unreasonably withholds consent or unreasonably denies approval of a sale, transfer, or assignment of any ownership

---

[11] The reason for this rule is best illustrated by a hypothetical discussed in *San Francisco Design Center Associates v. Portman Companies* (1995) 41 Cal.App.4th 29, 43, fn. 9. The court noted that if companies A and B are competing for a piece of lucrative business and A uses violence against the employees of B to prevail, B could sue A for intentional interference with prospective economic advantage, based on the battery committed against its employees.

interest in a beer wholesaler's business with respect to that manufacturer's brand or brands, shall be liable in damages to the beer wholesaler." It then limits the disappointed seller's damages to compensatory damages, but provides that if a successor purchaser acquires the distributorship, the manufacturer is liable only for the difference in the amount paid by the successor purchaser and the fair market value of the disappointed seller's distributorship.

As this provision provides only for damages to the disappointed seller, rather than the disappointed buyer, Crown argues that it cannot provide a legal basis for Crown's denial of approval to constitute an independently wrongful act as to Classic. We disagree. As discussed above, an act may be wrongful as to a third party only and still support a cause of action by a plaintiff for interference with prospective economic advantage.

However, we conclude that the statute does not provide a basis for Crown's denial of approval, even if unreasonable, to constitute an independently wrongful act. This statute, which provides a limited and conditional remedy for the disappointed seller *does not render the unreasonable denial of approval wrongful*. (Cf. Vehicle Code section 11713.3, which provides that "[i]t is unlawful" for a vehicle manufacturer to perform any act identified in its subdivisions, one of which provides, "There shall not be a transfer or assignment of the dealer's franchise without the consent of the manufacturer . . . which consent shall not be unreasonably withheld . . . .") Here, far from rendering the unreasonable denial of approval unlawful, Business and Professions Code section 25000.9 can be read to *permit* a beer manufacturer to unreasonably deny

13

approval for a transfer as long as the manufacturer compensates the disappointed seller for the compensatory damages lost.[12]

That Business and Professions Code section 25000.9 is so limited can be seen when we consider the facts of the instant case. Classic alleges that the denial of approval was independently wrongful because it violated this statute's "prohibition against a beer manufacturer . . . unreasonably withholding its consent or unreasonably denying approval of a sale, transfer, or assignment of any ownership interest in a licensed beer wholesaler's business with respect to that manufacturer's brand or brands." But Business and Professions Code section 25000.9 contains no such "prohibition." As long as the seller receives adequate compensation, either from a successor purchaser or the manufacturer itself, there is no violation of the statute. Indeed, Classic does not claim or assert that it could prove that HBC did not receive adequate compensation.

Solid policy reasons exist for a legislative choice that a beer manufacturer *may* decline to approve a transfer of a beer distributorship for an "unreasonable" reason, as long as it makes the disappointed seller whole. The sale of beer is a highly regulated

---

[12] The legislative history of Business and Professions Code section 25000.9 indicates that it was enacted in order to guarantee that wholesalers "be able to recover the fair market value of their business assets in the event a sale is unreasonably disapproved." (Assem. Com. on Governmental Organization, Rep. on Sen. Bill No. 1957 (1999-2000 Reg. Sess.) as amended Aug. 18, 2000, p. 2.) At no point does the legislative history indicate it was intended to *prevent* the manufacturer from denying approval, even on unreasonable grounds. (See also *Mussetter Distributing, Inc. v. DBI Beverage Inc.* (N.D. Cal. 2010) 685 F.Supp.2d 1028, 1033 [describing Business and Professions Code section 25000.9 as a provision "that regulate[s] the beer manufacturer/distributer's contractual relationship"].)

14

industry. All manufacturers, importers, and wholesalers shall file with the state a schedule of their prices. (Bus. & Prof. Code, § 25000.) No beer wholesaler may sell beer in the state unless it has first entered into a written agreement with the manufacturer, which sets forth the territorial limits in which the wholesaler may distribute the beer, and the agreement must be on file with the state. (Bus. & Prof. Code, § 25000.5, subd. (b).) In other words, when a beer distributor sells its right to distribute to another distributor, the new distributor *cannot sell the beer* in California without first entering into a contract with the manufacturer. If the manufacturer is not permitted to withhold its consent for any reason, it would be forced, by its distributor's choice of buyer, to enter into a new contract with the new distributor, *even if it does not wish to do business with the new distributor*. This is problematic. Barring law to the contrary, a manufacturer has the "right to select with whom to do business and on what terms." (*Chavez v. Whirlpool Corp.* (2001) 93 Cal.App.4th 363, 370; see also *Drum v. San Fernando Valley Bar Assn.* (2010) 182 Cal.App.4th 247, 254.) In drafting Business and Professions Code section 25000.9 to provide only a limited remedy to disappointed sellers, the Legislature was protecting the beer manufacturers' right to select the distributors with whom they choose to do business.[13]

In short, we conclude that Business and Professions Code section 25000.9 does not render the unreasonable denial of approval of a sale of a beer distributorship

---

[13] We further note that if Classic's argument were adopted, the disappointed seller, *with whom the manufacturer had a contract*, would be limited to compensatory damages, while the disappointed buyer, *who is a stranger to the manufacturer*, conceivably would be entitled to tort and punitive damages. This cannot be what the Legislature intended.

15

*unlawful*; it simply sets forth the price the manufacturer must pay its disappointed seller in the event of such a denial.[14] As a result, this statutory provision cannot be read to convert an unreasonable denial of approval by Crown into an independently wrongful act. Thus, Classic cannot rely on this statute as a legal basis for its causes of action for interference with prospective economic advantage.

4.    *Business and Professions Code Section 23300*

Classic next relies on Business and Professions Code section 23300 as the basis for which it argues Crown's denial of approval was independently wrongful. That statute, however, simply provides that no person shall exercise any act of a licensee unless that person possesses the necessary license. Classic argues that this statute provides that a manufacturer (or importer) cannot exercise the rights of a distributor, and, further, that the rights of a distributor include selecting any seller to whom to transfer the distributorship.

---

[14]    Looking at it another way, Crown's distributorship contract with HBC included a term that if any provisions of the contract conflicted with state law, the state law governed. Thus, we can read Business and Professions Code section 25000.9 as reading into the distributorship contract a provision that if Crown unreasonably denied approval of a transfer, Crown would compensate HBC according to the terms of the statute. An unreasonable denial of approval would grant a contractual remedy to HBC, but nothing to Classic. In this regard, Business and Professions Code section 25000.9 is simply a manifestation of the doctrine of efficient breach of contract. "Generally, the right of a contracting party to breach a contract and pay damages (nominally referred to as 'expectation damages'), instead of being required by law to perform, has driven legal economists to extol the principle of efficient breach of contract as ' "[o]ne of the most enlightening insights of law and economics." ' [Citation.] Essentially, where it is worth more to the promisor to breach rather than to perform a contract, it is more efficient for the law to allow the promisor to breach the contract and to pay the promisee damages based on the benefit the promisee expected to gain by the completed contract. [Citation.]" (*Huynh v. Vu* (2003) 111 Cal.App.4th 1183, 1198-1199.)

16

The sole authority on which Classic relies for this proposition is the AG's advisory letter on the topic, which sets forth the AG's position that certain provisions in beer distributorship contracts grant the manufacturers excessive control over the business decisions of their distributors. The advisory stated that the AG found problematic, "Manufacturers having the right to control or approve a wholesaler's acquisitions or divestitures of businesses or product lines, or a change in control of a wholesaler or a wholesaler's business, in either case including, but not limited to, a manufacturer's right of first refusal to purchase or right to appoint a designee purchaser."

Apart from whether the AG's advisory can be interpreted, as Classic would read it, to indicate AG disapproval of provisions allowing the manufacturer to unreasonably withhold consent to a sale of the distributorship, we conclude that, even if it did, it would provide no assistance to Classic. As we have discussed above, Business and Professions Code section 25000.9 *specifically* allows manufacturers to unreasonably withhold consent to a distributorship sale as long as they adequately compensate the selling distributors. Such a specific statute controls over the general statute (*Fujifilm Corp. v. Yang* (2014) 223 Cal.App.4th 326, ___.), which simply sets forth the necessity of licensure. Thus, Business and Professions Code section 23300 cannot be read to prevent what Business and Professions Code section 25000.9 permits, and it therefore provides no basis for finding the denial of approval to be independently wrongful.[15]

_____

[15]   Moreover, Classic's interpretation of Business and Professions Code section 23300 would run afoul of the proposition discussed above that, as a general

17

5.      *Fraudulent Concealment*

Finally, Classic argues that Crown's denial of approval was independently wrongful as it was the culmination of Crown's act of fraudulent concealment; specifically, Crown fraudulently concealed in 2008 that it had other plans for HBC's distributorship and would never approve Classic, no matter how much Classic's performance improved.

Preliminarily, Classic raised this argument for the first time in opposition to the motion for summary judgment. The independently wrongful act is an element which must be pleaded and proved by a plaintiff. Classic failed to plead fraudulent concealment as an independently wrongful act, even when filing its second amended complaint after Crown had moved for summary judgment. Classic cannot raise fraudulent concealment as a new basis for the independent wrongfulness of Crown's act after Crown had moved for summary judgment arguing against the two bases actually pleaded in Classic's complaint.

Even if, however, we overlook this procedural default, Classic cannot prevail with this argument. Classic takes the position that the denial of approval in 2010 was part of an act of fraudulent concealment that began in 2008. Specifically, Classic argues that it was told in 2008 that if it improved its performance, Crown would "leave the door open" to it being considered to purchase HBC's Crown distributorship later. Classic argues that this was fraudulent, in that Crown always intended that HBC's

matter, a manufacturer has the right to select with whom to do business. (*Chavez v. Whirlpool Corp., supra,* 93 Cal.App.4th at p. 370.)

18

distributorship be conveyed to a distributor related to Anheuser-Busch, and that Crown concealed those plans from it.  But any such fraudulent concealment would have necessarily occurred in 2008.  There is no claim of a fraudulent concealment in 2010; Crown openly denied approval to Classic at that time.  Classic is attempting to argue that the fraudulent concealment in 2008 rendered the denial of approval in 2010 independently wrongful.  This is incorrect; the denial of approval in 2010 *itself* must be independently wrongful.  Classic's argument regarding fraudulent concealment is insufficient.[16]

6.    *Conclusion*

As none of the three bases on which Classic purports to base its assertion that the denial of approval constituted an independently wrongful act apply, Classic cannot establish a cause of action for interference with prospective economic advantage.  As such, Crown's summary judgment motion should have been granted.

---

[16]    Even if Classic took the position that the *reasons* for Crown's 2010 denial of approval were fraudulently concealed in 2010, that does not render the *denial itself* fraudulent.

19

*DISPOSITION*

The petition for writ of mandate is granted. Let a writ of mandate issue directing the trial court to vacate its order denying Crown's motion for summary judgment and enter a new and different order granting the motion. The parties shall bear their own costs in connection with this writ proceeding.


*CERTIFIED FOR PUBLICATION*



CROSKEY, J.

WE CONCUR:



KLEIN, P. J.



KITCHING, J.