**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BANK OF NEW YORK, a banking
corporation organized under law
of New York,
        *Plaintiff-Appellant,*

                v.

FREMONT GENERAL CORPORATION, a
California corporation,
        *Defendant-Appellee.*

No. 05-56653

D.C. No.
CV-03-09238-CAS

ORDER
AMENDING
OPINION,
DENYING
PETITION FOR
REHEARING,
AND AMENDED
OPINION

Appeal from the United States District Court
for the Central District of California
Christina A. Snyder, District Judge, Presiding

Argued July 9, 2007
Submitted August 16, 2007
Pasadena, California

Filed February 1, 2008
Amended April 25, 2008

Before: Alex Kozinski, Chief Judge, Andrew J. Kleinfeld
and Richard C. Tallman, Circuit Judges.

Opinion by Judge Tallman

## COUNSEL

Robert L. Wallan (argued), Kimberly L. Buffington, Mariah L. Brandt, Pillsbury Winthrop Shaw Pittman LLP, Los Angeles, California, for appellant Bank of New York.

Michael C. Lieb (argued), Leemore Kushner, Willenken, Wilson, Loh & Lieb, Los Angeles, CA; Iain Nasatir, Pachulski Stang Ziehl Young Jones & Weintraub LLP, Los Angeles, California, for appellee Fremont General Corporation.

John F. Finston, Katherine J. Eddy, Sonnenschein Nath & Rosenthal LLP, San Francisco, California, for amicus curiae Superintendent of the State of New York as Ancillary Receiver of Fremont Indemnity Company and the New York Liquidation Bureau.

## ORDER

The opinion filed on February 1, 2008, and published at 514 F.3d 1008 (9th Cir. 2008), is AMENDED as follows:

Page 1019     After <BONY's damages are therefore the $14 million that the bank was legally obligated to

pay to the New York Insurance Department out of its own pocket.> insert a footnote stating: <On remand, Fremont General remains free to argue that these damages should be reduced by an amount proportionate to BONY's contribution, if any, to causing the harm. *See Sorensen* v. *Allred*, 112 Cal. App. 3d 717, 726 (Ct. App. 1980) (comparative fault doctrine applies to intentional torts).>

Page  1019   After <We remand to allow the district court to conduct such further evidentiary proceedings as necessary to resolve the issue of Fremont General's intention in causing the transfer.> insert a footnote stating: <Fremont General also claims that California's managerial privilege shields it from liability. *See Huynh* v. *Vu*, 111 Cal. App. 4th 1183, 1194-1201 (Ct. App. 2003). But the district court has not yet addressed this claim, so we do not consider it.>

The panel, as constituted above, has voted to deny the petition for panel rehearing.

The petition for panel rehearing is denied. No further petitions for rehearing or rehearing en banc will be accepted.

IT IS SO ORDERED.

---

**OPINION**

TALLMAN, Circuit Judge:

This case arises from a commercial bank deposit contract involving an account in which funds were held to secure the payment of claims in the highly regulated world of workers'

compensation insurance. The Bank of New York ("BONY") appeals the district court's entry of partial summary judgment against it and ultimately judgment against it following a bench trial. BONY brought suit against Fremont General Corporation ("Fremont General"), the ultimate corporate parent of Fremont Indemnity Company ("Fremont Indemnity") and Industrial Indemnity Company ("Industrial Indemnity")—two California insurance companies that provided workers' compensation policies to employers in several states, including California and New York.[1] BONY asserted claims for damages allegedly incurred as a result of Fremont General's withdrawal of $14 million from custodial accounts that Fremont Indemnity maintained at BONY. Fremont General's withdrawals violated New York Insurance law and the "custodian agreement" that Fremont Indemnity signed with BONY. According to BONY, Fremont General intentionally interfered with the custodian agreement between Fremont Indemnity and BONY, and converted the funds in the custodial accounts. We review the district court's judgment against BONY on Claim One for Interference with Contract and Claim Two for Conversion. We have jurisdiction under 28 U.S.C. § 1291, and we affirm in part, reverse in part, and remand.

I

A

Fremont Indemnity provided workers' compensation insurance services to New York residents. New York insurance law required Fremont Indemnity to maintain custodial

---

[1]Fremont General is the parent company of Fremont Compensation Insurance Group ("FCIG"), which, in turn, is the parent company of Fremont Indemnity and Industrial Indemnity. Fremont Indemnity and Industrial Indemnity merged in August 2001, leaving Fremont Indemnity as the surviving corporation. We collectively refer to Fremont Indemnity and Industrial Indemnity as "Fremont Indemnity."

accounts at a New York bank in trust for the benefit of Fremont Indemnity's policyholders as a condition to Fremont Indemnity writing workers' compensation insurance in New York. *See* N.Y. Ins. Law § 1314. By requiring insurance carriers to maintain such custodial accounts, the New York Insurance Department ensures that the carriers have adequate funds to pay claims in the event that they become insolvent. New York state law required Fremont Indemnity to enter into a Workers' Compensation Insurance Retaliatory Custodian Agreement ("custodian agreement") with BONY.[2] Fremont General managed Fremont Indemnity's investments pursuant to a written Services and Management Agreement.

The custodian agreement named BONY as the custodian and barred BONY from releasing funds without a written request from Fremont Indemnity and written approval from the Superintendent of Insurance of the State of New York ("Superintendent"). The agreement provided in relevant part:

> Securities placed in the custodian account shall be held by the Custodian, its successors or assigns, in custody exclusively for the Superintendent of Insurance of the State of New York, as trustee, in trust for the security of the workers' compensation insurance policyholders and claimants of the Company resident of New York State and free of any lien or other claim of the Custodian. . .
>
> Except as hereinafter provided, no securities in this account or any of the principal cash account held

---

[2]Industrial Indemnity entered into the custodian agreement with BONY on August 15, 1995; Fremont Indemnity entered into the same agreement on December 5, 1997. The agreements are "retaliatory" in that they are required of companies domiciled elsewhere who seek to write insurance in New York whose state of incorporation imposes a similar deposit condition on New York insurers doing business in that foreign state. *See* N.Y. Ins. Law §§ 1319, 1112; *Levin v. Nat'l Colonial Ins. Co.*, 806 N.E.2d 473, 477 (N.Y. 2004).

> pursuant to this Agreement shall be released by the Custodian except upon receipt of a written request of the Company and written approval by or in the name of the Superintendent of Insurance. . .
>
> Custodian shall be accountable to the Superintendent of Insurance for the safekeeping of the securities and cash reserves held by it under this Agreement.

New York Insurance Law sections 1314 and 1318 permit insurance carriers to withdraw from custodial accounts interest earned on the deposited principal, but not the principal itself. Insurance carriers typically sweep the custodial accounts to withdraw the interest as it is earned. Fremont General, acting as Fremont Indemnity's investment manager, initially deposited in the custodial accounts interest-bearing securities—California State Veterans bonds in the amount of $10 million—that made no periodic partial principal repayments. Fremont General, however, then sought and obtained approval from the New York Insurance Department to substitute Government National Mortgage Association ("GNMA") securities in place of the interest-bearing securities.[3]

Because GNMA securities make periodic payments of principal along with payments of interest, the New York Insurance Department initially found them unacceptable trust deposit securities for Fremont Indemnity's custodial account. Fremont General proposed alternatives to alleviate the regulatory concerns about Fremont Indemnity potentially receiving principal payments as the GNMA securities paid principal into the custodial account. The New York Insurance Department ultimately approved substitution of GNMA securities contingent on a commitment by Fremont Indemnity's Board of Directors, who agreed by unanimous written consent to "replace any GNMA or GNMA CMO security on deposit

---

[3]GNMA securities are mortgage-backed securities that return principal over time rather than in one lump sum on maturity.

before any return of principal is made." Here lies the genesis of the lawsuit.

In October 2000, Fremont General replaced the existing bonds in the custodial accounts with GNMA securities with a principal value of approximately $14 million. Before May 2002, all returns on investment in the custodial accounts were of interest only. The first periodic credit including partial repayment of principal occurred in May 2002. In September 2000, Fremont General gave BONY a standing order to transfer all cash in the custodial account to Fremont Indemnity's non-custodial account at J.P. Morgan Chase. Acting pursuant to that order, BONY transferred the May 2002 principal payment out of the custodial account—and continued to do so through September. Beginning in October 2002, BONY required Fremont General to send monthly letters specifying how much cash BONY should transfer. Following Fremont General's instructions, between May 2002 and April 2003, BONY transferred approximately $14 million from the custodial accounts to the J.P. Morgan Chase Account.[4] New York's Superintendent of Insurance never authorized BONY to release principal held in the custodial accounts. Evidence at trial showed that some BONY employees knew about the requirement for regulatory approval of reductions in principal contained in the custodian agreement, but BONY nonetheless honored the requests and transferred the money.

---

[4]BONY initiated eleven separate wire transfers, totaling about $3.2 million, between May 2002 and September 2002 under Fremont General's repetitive wire instructions provided to BONY two years earlier. In October 2002, BONY required specific letter requests for any further distributions. As a result, Fremont General issued monthly letters—the first two on Fremont General letterhead and the remaining letters on Fremont Indemnity letterhead—authorizing BONY to transfer all cash from the custodial accounts to the J.P. Morgan Chase account. (We refer to all transfers from the custodial accounts to Fremont Indemnity's J.P. Morgan Chase account collectively as "the transfer.") BONY cites Fremont General's switching of letterhead as the best evidence of bad faith in this case because BONY claims it shows that Fremont General knew the transfer requests were wrongful under the terms of the custodian agreement.

Meanwhile, Fremont Indemnity ran into financial difficulties which ultimately resulted in the company being placed in conservatorship. In November 2000, the California Department of Insurance, Fremont Indemnity, Fremont General, and FCIG entered into a Letter Agreement of Regulatory Oversight in which the Department appointed a Special Deputy Examiner to supervise FCIG and Fremont Indemnity. This agreement prohibited Fremont Indemnity from making payment to, engaging in any transaction, or entering into any agreement directly or indirectly with Fremont General, absent the approval of the California Department of Insurance. Nor could Fremont Indemnity make any dividend payment or other distribution to Fremont General without the prior approval of the California Department of Insurance.

When FCIG's financial health further deteriorated, Fremont General, FCIG, Fremont Indemnity, and the California Department of Insurance entered into a second letter agreement in July 2002 called "Letter Agreement of Run-Off and Regulatory Oversight of the Fremont Compensation Insurance Group, Inc. Workers' Compensation Insurance Companies." Fremont Indemnity was now completely prohibited from engaging in transactions with its parent or affiliate. The district court found as a matter of fact that Fremont General never "engage[d] in any transactions that violated the [November letter agreement]," and that it "substantially complied" with the July letter agreement.

The situation worsened. On June 4, 2003, the California Department of Insurance obtained an order conserving Fremont Indemnity; shortly thereafter, the Superior Court of the State of California for the County of Los Angeles converted the conservatorship into a liquidation proceeding. After the California Department of Insurance commenced conservation proceedings, the New York Insurance Department contacted BONY asking for an accounting of the funds in the custodial accounts. BONY reported that one of its employees— unaware that the funds included both principal repayments

and interest—had wire-transferred the cash from those accounts as Fremont General had requested. BONY conducted an internal investigation of the transfers and determined that BONY was at least partially responsible for mistakenly transferring principal from the custodial accounts. On March 3, 2004, in response to the New York Insurance Department's repeated demands on BONY to replace the $14 million in principal, BONY entered into a Settlement Agreement with the New York regulators to pay $13,939,999.90 principal and $580,833.31 in interest. The Superintendent then assigned his claims against Fremont General to BONY as part of this settlement. According to BONY, the agreed upon amount paid to settle the threatened New York litigation constitutes the measure of damages in this action.

On November 30, 2004, the Insurance Commissioner for the State of California, the Conservator of Fremont Indemnity, and the New York Insurance Department executed an "Agreement for Early Access Distribution of Funds" with the Fremont Indemnity estate. In this agreement, the New York Department agreed to accept a pro rata distribution from the Fremont Indemnity estate and to return to the Fremont Indemnity estate any excess distribution it had received from the estate.

B

On December 17, 2003, BONY filed a complaint against Fremont General for intentional interference with contract, conversion, money had and received, unjust enrichment, restitution, unfair competition, and constructive trust. The operative First Amended Complaint alleges that Fremont General knew of the restrictions and terms of the custodian agreement, yet it nonetheless instructed BONY to wire transfer $14 million of principal from the custodial account to Fremont Indemnity's J.P. Morgan Chase account without the Superintendent's approval. Consequently, Fremont General caused BONY to suffer damages in at least that amount.

On June 17, 2005, the district court granted Fremont General's motion for partial summary judgment on BONY's claims of intentional interference with contract and restitution. Because the district court found that "no breach or damages occurred as a result of [Fremont General's] conduct," it could not hold Fremont General liable for intentional interference with contractual relations between BONY and Fremont Indemnity.

The court then proceeded to conduct a bench trial in August 2005 on the remaining claims. The district court issued findings of facts and conclusions of law and entered final judgment in favor of Fremont General. The district court concluded that BONY could not prevail on its conversion claim for several reasons, including the fact that neither BONY nor the New York Insurance Department suffered damages from BONY's release of the funds. BONY appeals.

## II

We review de novo the district court's order granting Fremont General partial summary judgment. *Scheuring v. Traylor Bros., Inc.*, 476 F.3d 781, 784 (9th Cir. 2007). Federal Rule of Civil Procedure 56(c) governs our review of summary judgment motions, and we must view the evidence on summary judgment in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Id.* We review the district court's findings of fact following the bench trial for clear error and its conclusions of law de novo. *Jarvis v. K2 Inc.*, 486 F.3d 526, 529 (9th Cir. 2007).

## III

## A

To prevail on its intentional interference with contract claim, BONY had to show (1) the existence of a valid contract between BONY and a third party, (2) Fremont General's

knowledge of the contract, (3) intentional acts designed to induce a breach or to disrupt a contractual relationship, (4) actual breach or disruption of the contractual relationship, and (5) resulting damage. *See Reeves v. Hanlon*, 95 P.3d 513, 517 (Cal. 2004) (citing *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 791 P.2d 587, 590 (Cal. 1990)). The third element required BONY to show that Fremont General knew the interference was certain or substantially certain to occur as a result of its action, *see id.*, and no liability can arise unless Fremont General's alleged wrongful or unjustified conduct caused the breach, *see Weiss v. Marcus*, 124 Cal. Rptr. 297, 303 (Ct. App. 1975); *Augustine v. Trucco*, 268 P.2d 780, 791 (Cal. Dist. Ct. App. 1954) (citing *Hill v. Progress Co.*, 180 P.2d 956, 961 (Cal. Dist. Ct. App. 1947)).

1

The district court concluded that, whatever Fremont General's intention in requesting the transfer, those requests did not actually cause the transfer. Rather, the transfer occurred as a result of BONY's breach of its independent duty to secure written permission from the Superintendent before transfer. In reaching this conclusion, the district court appears to have applied the wrong legal standard for causation.

**[1]** California employs the "substantial factor" test for determining causation in intentional torts cases. *See Franklin v. Dynamic Details, Inc.*, 10 Cal. Rptr. 3d 429, 441 (Ct. App. 2004) (applying the substantial factor test in an intentional interference with contractual relations action and noting that "a cause of . . . damage . . . is something that is a substantial factor in bringing about . . . damage"). "The substantial factor standard generally produces the same results as does the 'but for' rule of causation which states that a defendant's conduct is a cause of the injury if the injury would not have occurred 'but for' that conduct." *Rutherford v. Owens-Illinois, Inc.*, 941 P.2d 1203, 1214 (Cal. 1997) (citing *Mitchell v. Gonzales*, 819 P.2d 872, 879 (Cal. 1991)). California law defines "substan-

tial" expansively, and at least one court has cautioned against placing "undue emphasis" on the ordinary meaning of that word. *Rutherford*, 941 P.2d at 1214. Although "a force which plays only an 'infinitesimal' or 'theoretical' part in bringing about injury, damage, or loss is not a substantial factor," the substantial factor test is a "broader rule of causality than the 'but for' test." *Id.* (citing *People v. Caldwell*, 681 P.2d 274, 280 (Cal. 1984); Prosser & Keeton on Torts (5th ed. 1988 supp.) § 41, pp. 43-44); *see also U.S. Fid. & Guar. Co. v. Am. Employer's Ins. Co.*, 205 Cal. Rptr. 460, 465 (Ct. App. 1984) ("The critical question as to causation in intentional torts is whether the actor's conduct is a substantial factor in bringing about the type of harm which he intended from his original act. [N]o consideration is given to the fact that after the event it appears highly extraordinary that it should have brought about such harm or that the actor's conduct has created a situation harmless unless acted upon by other forces for which the actor is not responsible.") (quoting *Tate v. Canonica*, 5 Cal. Rptr. 28, 35 (Dist. Ct. App. 1960)) (internal citations and some punctuation omitted).

Relatedly, "the notion of independent intervening cause has no place in the law of intentional torts, so long as there is a *factual* chain of causation." *United States Fid. & Guar. Co.*, 205 Cal. Rptr. at 465 (quoting *Tate*, 5 Cal. Rptr. At 35). "[T]he fact that the actor's conduct becomes effective in harm only through the intervention of new and independent forces for which the actor is not responsible is of no importance." *Tate*, 5 Cal. Rptr. at 35.

**[2]** Thus, we must decide in this case whether Fremont General's conduct was a substantial factor in causing the transfer. *See* Judicial Council of Cal. Civil Jury Instructions No. 2201 (listing as an element of intentional interference with contractual relations, "[Defendant's] conduct was a substantial factor in causing [Plaintiff's] harm"). We believe that the district court's findings of fact compel the legal conclusion that Fremont General's conduct meets this standard. Irre-

spective of BONY's conduct, Fremont General made multiple requests that funds from the custodial accounts be transferred to Fremont Indemnity's separate account, and those funds were indeed transferred. But for Fremont General's conduct, the funds never would have been transferred.[5]

**[3]** In essence, Fremont General contends that BONY's breach of its independent duty to secure written permission from the Superintendent before transferring the funds was an intervening force that acts as a barrier to liability for Fremont General. Fremont General is mistaken. The causation analysis turns on whether "there is a factual chain of causation," not whether there has been an intervening act. *U.S. Fid. & Guar. Co.*, 205 Cal. Rptr. at 465 (quoting *Tate*, 5 Cal. Rptr. at 35) (emphasis omitted). Such a chain exists here. Though BONY's violation of its independent duty undoubtedly played a role in the transfer, that role does not break the "factual chain of causation." We therefore conclude that, as a matter of law, BONY has met the causation element of its intentional interference with contract claim.

2

We turn to the remaining elements of BONY's intentional interference with contract claim. We must determine whether there are still issues of fact with respect to those elements. If issues of fact exist, we must remand to the district court to conduct, as necessary, further evidentiary proceedings to resolve those issues.

**[4]** There is no dispute as to the first element: there is a valid contract between BONY and Fremont Indemnity. As for

---

[5]The district court's finding that Fremont General "took no action" in causing the transfer of the first $3.2 million is clearly erroneous, and indeed, that finding conflicts with the district court's earlier finding that those funds were transferred "pursuant to recurring wire transfer instructions provided by Fremont General on behalf of [Fremont Indemnity]."

the second element, no issues of fact remain. Fremont General was aware of the contract. Fremont General was responsible for managing the funds deposited into the custodial account, and indeed, Fremont General obtained special permission from the New York Insurance Department to deposit GNMA securities into the custodial account. Fremont General could not have negotiated with the New York Insurance Department to allow the deposit of those securities if Fremont General was unaware of the custodian agreement between Fremont Indemnity and BONY. There can also be no real dispute as to the fourth element. The transfer of funds out of the custodial account constituted a breach of the custodian agreement.

3

[5] Next, we turn to the issue of Fremont General's intention in causing the transfer. The basic requirement is that Fremont General intended to cause a breach or disruption of the custodian agreement between Fremont Indemnity and BONY. However, BONY is not required to present direct evidence of Fremont General's intention. " 'Intent, of course, may be established by inference as well as by direct proof.' Thus, the jury may 'infer culpable intent from conduct "substantially certain" to interfere with the contract.' " *Savage v. Pac. Gas & Elec. Co.*, 26 Cal. Rptr. 2d 305, 314 (Ct. App. 1993) (quoting *Seaman's Direct Buying Serv., Inc. v. Standard Oil Co.*, 686 P.2d 1158, 1165 (Cal. 1984)). Since there is no direct evidence of Fremont General's intention, we must determine whether there is evidence from which a finder of fact could reasonably infer its intention, or evidence that Fremont General conducted itself in a manner substantially certain to interfere with the contract.

[6] "Generally, the knowledge of a corporate officer within the scope of his employment is the knowledge of the corporation." *Meyer v. Glenmoor Homes, Inc.,* 54 Cal. Rptr. 786, 800-01 (Ct. App. 1966) (citation omitted). David Brody, Fremont General's Assistant General Counsel, knew no later than

November 2002 that Fremont General was causing the transfer of principal from the custodial account. There is evidence from which the finder of fact could reasonably deduce that he knew the transfer of principal violated the terms of the custodian agreement. Although Brody did not personally cause the transfers, a jury could find that he knew about them and effectively sanctioned them by failing to stop them from occurring. Brody's knowledge and conduct must be imputed to Fremont General. *Id*. From this evidence, a reasonable finder of fact could conclude that Fremont General through Brody caused the transfer of principle with the intention of disrupting the contract at issue.

The change in letterhead discussed in footnote four also serves as evidence of Fremont General's intention. One possible explanation for the change is that it was part of a wider corporate policy, unrelated to the transfer. Another reasonable explanation is that Brody knew that his corporation was intentionally causing the breach of Fremont Indemnity's contract with BONY and did not want his own company's name to appear on any of the relevant documents. The finder of fact must resolve that question.

**[7]** Because contested issues of material fact remain with respect to Fremont General's intention in causing the transfer of funds out of the BONY custodial account, we remand the case to the district court to conduct further proceedings as necessary to resolve the dispute.

4

**[8]** The final element of BONY's intentional interference claim is damages. Following the bench trial, the district court entered findings of fact and conclusions of law with respect to the damages element of BONY's conversion claim. Because the damages analysis for both claims is effectively the same — BONY must prove that it, or the New York Insurance Department, was negatively impacted by the trans-

fer to Fremont Indemnity's separate J.P. Morgan Chase account — we apply those findings of fact and conclusions of law to BONY's intentional interference claim.[6] We now review those findings of fact for clear error and the conclusions of law *de novo*.

**[9]** BONY's alleged damages are derivative of the New York Insurance Department's. According to BONY, the New York Insurance Department was damaged because if the transfer had not occurred, the Department would have been entitled to retain control over the full $14 million and use it exclusively to pay the claims of Fremont Indemnity's New York policyholders. But the transfer did occur, and as a result, the New York Insurance Department wound up with only a pro rata share of Fremont Indemnity's liquidated assets, which amounted to about $3.8 million.

**[10]** In response, Fremont General relies on New York Insurance Law § 1314(a)(2), which states that, "All such securities shall be held by the superintendent, in trust, without preference or priority to any beneficiary entitled to share therein, for the security of the depositing insurer's policyholders within the United States." According to Fremont General, § 1314(a)(2) establishes that even if the transfer had not occurred, the New York Insurance Department would not have been entitled to use the full $14 million to pay the claims of Fremont Indemnity's New York insureds, but instead would have been entitled only to a pro rata share of Fremont Indemnity's estate. In other words, regardless of whether the transfer had occurred, the New York Insurance Department

---

[6]The alternative — remanding the case to allow the district court to enter findings of fact and conclusions of law with respect to BONY's intentional interference claim — would be pointless, because the district court, under the law of the case doctrine, would be effectively precluded from reconsidering the issue of damages since it has already decided that issue in the context of BONY's conversion claim. *See Milgard Tempering, Inc. v. Selas Corp. of Am.*, 902 F.2d 703, 715 (9th Cir. 1990).

would have been in the same position. The district court agreed with Fremont General's position.

**[11]** We do not. Although the district court's interpretation of § 1314(a)(2) is correct, that provision does not apply to the instant case because Fremont Indemnity was domiciled outside of New York. Under New York's "reciprocity statute," New York treats the deposits of an insurer domiciled out-of-state in the same manner as that insurer's state of domicile treats the deposits of New York insurers. N.Y. Ins. Law § 1112.[7] Fremont Indemnity is domiciled in California, so we must look to how California treats the special deposits of New York insurers doing business in California.

In California,

> In order to provide protection to the workers of this state in the event that the insurers issuing workers' compensation insurance to employers fail to pay compensable workers' compensation claims . . . every insurer desiring admission to transact workers' compensation insurance . . . shall, as a prerequisite to admission . . . deposit [approved funds] . . . with a qualified depository. . . . The deposit shall be for the purpose of paying compensable workers' compensation claims under policies issued by the insurer . . . in the event the insurer . . . fails to pay those claims when they come due.

Cal. Ins. Code § 11691(a). "The proceeds of the deposit required pursuant to Section 11691 shall be used solely to pay

---

[7]New York Insurance Law section 1112(a)(1) provides: "If, by the laws . . . of any other state, any insurer organized or domiciled in this state . . . shall be, required to deposit securities in such other state to protect policy-holders . . . then all similar insurers organized or domiciled in such other state . . . *shall make like deposits for like purposes with the superintendent* . . . ." (emphasis added).

compensable workers' compensation claims under the insured
. . . policies . . . ." Cal. Ins. Code § 11698.02. California
defines a "compensable workers' compensation claim" as "a
claim where the claimant is entitled to benefits under the
workers' compensation law of the state [of California]." Cal.
Ins. Code § 11690(a).

[12] Read together, these provisions authorized the Super-
intendent to use Fremont Indemnity's funds on deposit in
BONY for the sole benefit of Fremont Indemnity's New York
policyholders. The terms of the custodian agreement support
this conclusion. Under the terms of that agreement,
"[s]ecurities placed in the custodian account shall be held by
Custodian . . . in custody exclusively for the Superintendent
. . . , as trustee, in trust *for the security of the workers' com-
pensation insurance policyholders and claimants of the Com-
pany resident of New York State . . . .*" (emphasis added).

[13] Fremont General contends that the New York Insur-
ance Department's decision to enter into the Early Access
Agreement, in which the New York Insurance Department
agreed to accept a pro rata distribution of the Fremont Indem-
nity estate, demonstrates that the New York Insurance Depart-
ment was not entitled to the full $14 million, because
otherwise it never would have agreed to accept far less than
that. However, the New York Insurance Department's inten-
tion in entering into the Early Access Agreement is irrelevant.
The essential fact is that under New York's reciprocity stat-
ute, the Superintendent was entitled to use the $14 million as
security solely for the benefit of New York policyholders.
That it later agreed to accept $3.8 million as its pro rata share
of the California conservatorship is irrelevant to BONY's
damages in this action.

The New York Insurance Department, as the holder of a
security, was damaged when Fremont General caused a
reduction in that security's value. *See Baldwin v. Marina City
Props.*, 145 Cal. Rptr. 406, 411 (Ct. App. 1978) (citing *U.S.*

*Fin. v. Sullivan*, 112 Cal. Rptr. 18, 23-25 (Ct. App. 1974)). In *Baldwin*, the plaintiffs sold their share in a limited partnership to the defendants, who paid cash and executed promissory notes payable to the plaintiffs. 145 Cal. Rptr. at 409. As security on the promissory note indebtedness, the plaintiffs retained a security interest in the partnership. *Id.* Ultimately, the defendants defaulted on the promissory notes, and also took actions that caused a reduction in the value of the security interest. *Id.* at 410. The court noted that the plaintiffs were permitted to maintain an action for the impairment of the value of their security, and such an action "may be brought whether or not the debtor is in default." *Id.* at 411 (citing *U.S. Financial*, 112 Cal. Rptr. at 23-25).

**[14]** The principles discussed in *Baldwin* apply here. At the moment the funds were transferred from the custodial account, BONY was liable for the full amount to the New York Insurance Department, which, as trustee of those funds, stood in the shoes of Fremont Indemnity's New York policy-holders. As *Baldwin* makes clear, the New York Insurance Department was not required to wait to sue BONY until Fremont Indemnity defaulted on any of the claims of its insureds.

**[15]** At the time BONY settled with the New York Insurance Department, the Department had not yet received a penny from Fremont Indemnity's bankrupt estate. Though the estate later paid the Department $3.8 million, none of that money was returned to BONY. BONY's damages are therefore the $14 million that the bank was legally obligated to pay to the New York Insurance Department out of its own pocket.[8]

**[16]** We reverse the grant of partial summary judgment in

---

[8]On remand, Fremont General remains free to argue that these damages should be reduced by an amount proportionate to BONY's contribution, if any, to causing the harm. *See Sorensen v. Allred*, 112 Cal. App. 3d 717, 726 (Ct. App. 1980) (comparative fault doctrine applies to intentional torts).

favor of Fremont General. We remand to allow the district court to conduct such further evidentiary proceedings as necessary to resolve the issue of Fremont General's intention in causing the transfer.[9]

## B

**[17]** BONY argues that the district court erred by not finding Fremont General liable for conversion where Fremont General, according to BONY, prevented BONY from freely exercising control or ownership over its property. A conversion occurs where the defendant wrongfully exercises dominion over the property of another. *Greka Integrated, Inc. v. Lowrey*, 35 Cal. Rptr. 3d 684, 691 (Ct. App. 2005) (citing *Farmers Ins. Exch. v. Zerin*, 61 Cal. Rptr. 2d 707, 709 (Ct. App. 1997)). To establish conversion, a plaintiff must show (1) his ownership of or right to possess the property at the time of the conversion, (2) that the defendant disposed of the plaintiff's property rights or converted the property by a wrongful act, and (3) damages. *Messerall v. Fulwilder*, 245 Cal. Rptr. 548, 550 (Cal. Ct. App. 1988) (citing *Baldwin*, 145 Cal. Rptr. at 416).

**[18]** A plaintiff in a conversion action must also prove that it did not consent to the defendant's exercise of dominion. *See Farrington v. A. Teichert & Son, Inc.*, 139 P.2d 80, 83 (Cal. Dist. Ct. App. 1943) (holding that no conversion action exists where the plaintiff consented to the removal of his personal property); *see also, e.g.,* Judicial Council of Cal. Civil Jury Instructions No. 2100 (listing plaintiff's lack of consent as an element of conversion); *Tavernier v. Maes*, 51 Cal. Rptr. 575, 587-88 (Dist. Ct. App. 1966) ("As to intentional invasions of the plaintiff's interests, his consent negatives the wrongful

---

[9]Fremont General also claims that California's managerial privilege shields it from liability. *See Huynh v. Vu*, 111 Cal. App. 4th 1183, 1194-1201 (Ct. App. 2003). But the district court has not yet addressed this claim, so we do not consider it.

element of the defendant's act, and prevents the existence of a tort. 'The absence of lawful consent,' said Mr. Justice Holmes, 'is part of the definition of an assault.' The same is true of . . . conversion . . . .") (citations omitted). In *Farrington*, the appeals court affirmed a judgment against the plaintiff on his conversion claim arising out of the removal of sand, rock and gravel from his land. 139 P.2d at 81. The court reasoned that the plaintiff had consented to the removal because he had simply watched as the defendant made multiple trips to the plaintiff's land, removing truckloads of sand, rock and gravel each time. *Id.* at 82. The court noted that, "[T]he law is well settled that there can be no conversion where an owner either expressly or impliedly assents to or ratifies the taking, use or disposition of his property." *Id.* at 83.

**[19]** In the present case, the district court found that BONY knew that the money it was transferring to Fremont Indemnity's separate account was principal. "Beginning in May 2002, the GNMAs began making unscheduled principal reduction payments. Various documents regarding the transfer of principal approved by various [BONY] account supervisors . . . indicate that [BONY] was aware that the GNMAs were generating principal reduction payments, but [BONY] nonetheless transferred those funds to the J.P. Morgan Chase account . . . ." This factual finding establishes that BONY consented to the transfer, despite knowing the transfer required written approval from the Superintendent. Under *Farrington*, this consent forecloses BONY's conversion claim, unless BONY can demonstrate that the district court's finding is clearly erroneous. BONY has not carried this heavy burden.[10]

---

[10]Although the district court did not rely on its finding of consent as a basis for its ruling in Fremont General's favor, "[w]e may affirm on any basis supported by the record, whether or not relied upon by the district court." *Hall v. N. Am. Van Lines, Inc.*, 476 F.3d 683, 686 (9th Cir. 2007).

IV

We affirm the district court's judgment in favor of Fremont General on the conversion claim. We reverse the district court's grant of partial summary judgment in Fremont General's favor on the intentional interference with contract claim, and remand to allow the district court to conduct such proceedings as necessary to resolve the outstanding issues as discussed in this opinion. Each party shall bear its own costs.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**