### OAKLEY, INC.

v.

### NIKE, INC. et al.

### No. SACV 12–2138 JVS (MLGx).

United States District Court, C.D. California.

Dec. 18, 2013.

Ali R. Rabbani, John E. Schreiber, Matthew M. Walsh, Winston and Strawn LLP, Los Angeles, CA, David G. Feher, Joseph A. Dibenedetto, Winston and Strawn LLP, New York, NY, for Oakley, Inc.

Jeffrey T. Thomas, Jeffrey H. Reeves, Joseph A. Gorman, Sean S. Twomey, Gibson Dunn and Crutcher LLP, Irvine, CA, for Nike, Inc. et al.

**Order GRANTS Defendant's Motion for Summary Judgment and for Judgment on the Pleadings (Fld 11–18–13) and DENIES Plaintiff's Motion for Partial Summary Judgment (Fld 11–18–13)**

JAMES V. SELNA, Judge.

Defendant Nike, Inc. ("Nike") moves for summary judgment as to Plaintiff Oakley Inc.'s ("Oakley") claim for intentional interference with contractual relations, and judgment on the pleadings, or alternatively summary judgment, on Oakley's unfair competition and declaratory relief claims. (Mot. for Summ. J. ("Nike MSJ"), Docket No. 94.) Oakley has filed an opposition. (Opp'n to Nike MSJ, Docket No. 109.) Nike has replied. (Nike Reply, Docket No. 123.)

At the same time, Oakley moves for partial summary judgment, seeking judgment on its claim for intentional interference. (Mot. for Summ. J. (Oakley MSJ, Docket No. 97).) Nike opposes. (Opp'n to Oakley MSJ, Docket No. 110.) Oakley has replied. (Oakley Reply, Docket No. 124.)

For the following reasons, the Court GRANTS Nike's motion for summary judgment on the intentional interference claim and GRANTS Nike's motion for judgment on the pleadings on the unfair competition and declaratory relief claims. The Court DENIES Oakley's motion for summary judgment on the intentional interference claim.

## I. *Background* [1]

Oakley is a Washington corporation whose products include eyewear, apparel and accessories. (First Am. Compl. ("FAC") ¶¶ 3, 7, Docket No. 8.) Nike is an Oregon corporation whose products include golf footwear, apparel, clubs, balls, accessories, and eyewear. (*Id.* ¶ 4.) Rory McIlroy ("McIlroy") is a professional golfer. (*Id.* ¶ 8.) From 2011 until the present, Oliver Hunt ("Hunt") served as an attorney for McIlroy. (*Id.* ¶ 25.) From 2011 until 2013, Conor Ridge ("Ridge") served as McIlroy's sports agent, and during the times relevant to this litigation possessed a power of attorney and was authorized to enter into agreements on McIlroy's behalf. (*Id.* ¶ 24; Reeves Decl. Ex 27, Docket No. 94–4.)

In 2010, Oakley and McIlroy signed a two-year endorsement agreement covering the term January 1, 2011 through December 31, 2012. (Reeves Decl. Ex. 2, ¶ 6.) The contract between Oakley and McIlroy included a "right of first refusal" provision, requiring McIlroy to provide Oakley a right of first refusal regarding any offer received for an endorsement agreement covering the period after the McIlroy–

---

**1.** The Court relies on Nike and Oakley's Statements of Undisputed Facts ("Nike SUF," Docket No. 94–1; "Oakley SUF," Docket No. 97–2.), evidence cited in the parties' respective oppositions, and supporting papers. Unless otherwise noted, the facts set forth are uncontroverted. The Court discusses further factual details in its analysis below as necessary. To the extent challenged evidence is material to the Court's decision, objections are resolved as stated herein. Objections to evidence the Court does not rely on are immaterial, and the Court does not rule on them. The Court does not rely on legal conclusions presented as facts.

Oakley agreement.[2] (*Id.* ¶ 8.)

During 2012, McIlroy received offers to enter into commercial relationships with a number of companies, including Nike. (*Id.* Ex. (McIlroy Depo. Tr. 116:10–17).) Ridge and Hunt were among McIlroy's representatives in negotiations with Nike. (*Id.* Ex. 10 (Ridge Depo. Tr.) 13:14–17; *id.* Ex. 9 (Hunt Depo. Tr.) 8:19–23.) Among Nike's representatives were John Matterazzo ("Matterazzo"), from Nike's General Counsel's office, and Jonathan Banks, a Nike executive. (Matterazzo Decl. ¶¶ 1, 7, Docket No. 94–3.) During a telephone conversation on September 12, 2012, Hunt told Matterazzo that McIlroy was free to seriously discuss a potential endorsement agreement with Nike. (*Id.* ¶ 5.) On September 25, 2012, Nike extended to McIlroy's representatives a substantial offer under which McIlroy would endorse Nike's golf products for five years beginning in January 2013, terms to which McIlroy's representatives agreed in principle. (Banks Decl. ¶ 9, Docket No. 94–2.)

Nike had stated to McIlroy's representatives on numerous occasions over the course of its earlier discussions that it did not want to sign a contract with McIlroy until McIlroy was contractually able to do so—"the number could well exceed fifty (50) times." (Banks Decl. ¶¶ 4–7, 15–16.) Also, the representations in the Nike–McIlroy agreement providing that Nike's rights were not subject to those of any third party and that McIlroy represented that he was free to enter the agreement were a part of Nike's proffered short-form agreement before Nike learned of Oakley's right of first refusal. (Matterazzo Decl. ¶ 8.)

On September 28 and 29, 2012, Banks and Matterazzo (on behalf of Nike) and Ridge and Hunt (on behalf of McIlroy) met in Chicago to negotiate an endorsement deal, the basic contours of which had already been agreed to orally. (Banks Decl. ¶¶ 9–10.) One additional person from each side was present on September 28, but only the four named were involved in the September 29 discussions. (*Id.* ¶ 10.) It was during discussion on September 29 that Hunt first raised the issue of Oakley having a right of first refusal, and asked that the Nike–McIlroy contract be made subject to Oakley's rights. (Schreiber Decl. Ex. 24 (Hunt Depo. Tr.) 11:21–12:11, Docket No. 109–2.). As soon as Oakley's right of refusal was mentioned, Ridge stated that "they've [Oakley] told me they're not going to match and they won't match." (*Id.* 13:17–14:6.) Banks then said, "And they can't match, can they?" (*Id.* 14:11–15:24.) Ridge clarified that Oakley had said it would not and could not match several more times (*Id.* 14:25–15:13.). When Hunt expressed concern about a "technicality," Ridge reiterated that Oakley would not match, mentioning a call with an Oakley executive who had, according to Ridge, said that Oakley would not exercise its right. (*Id.* 15:18–16:5.)

Banks next said that Nike would not make the contract subject to an Oakley right but that the issue was one for McIlroy's representatives to discuss. (*Id.* 21:14–24.) Banks and Matterazzo left the room for the matter to be decided. (21:25–22:1.) When the two returned, Ridge signed the agreement, including the covenant that McIlroy had no obligations that would prevent him from entering an agree-

---

**2.** Though the correct interpretation of the right of refusal provision is hotly contested, as the Court will discuss further below, it is not necessary to deal with it here. The Court grants summary judgment to Nike on other grounds, and it is only necessary to know that there was such a provision, and that neither party contests its validity (at least under their respective interpretations).

ment with Nike. (Matterazzo Decl. ¶¶ 12–13, Docket No. 94–3.)

On December 10, 2012, Oakley filed this action against McIlroy for breach of contract, and against Nike for intentional interference with contractual relations, unfair competition, and declaratory relief. (Compl., Docket No. 1.)

## II. *Legal Standards*

### A. *Summary Judgment*

Summary judgment is appropriate only where the record, read in the light most favorable to the nonmoving party, indicates that "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c)(2); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary adjudication, or partial summary judgment "upon all or any part of [a] claim," is appropriate where there is no genuine issue of material fact as to that portion of the claim. Fed.R.Civ.P. 56(a, b); *see also Lies v. Farrell Lines, Inc.,* 641 F.2d 765, 769 n. 3 (9th Cir.1981) ("Rule 56 authorizes a summary adjudication that will often fall short of a final determination, even of a single claim ....") (internal quotation marks omitted).

Material facts are those necessary to the proof or defense of a claim, and are determined by reference to substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. A fact issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. To demonstrate a genuine issue, the opposing party

"must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations and internal quotation marks omitted). In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. Nevertheless, inferences are not drawn out of the air, and the opposing party must produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines,* 602 F.Supp. 1224, 1244–45 (E.D.Cal.1985), *aff'd,* 810 F.2d 898, 902 (9th Cir.1987).

The burden initially is on the moving party to demonstrate an absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. If the moving party meets its burden, then the nonmoving party must produce enough evidence to rebut the moving party's claim and create a genuine issue of material fact. *See id.* at 322–23, 106 S.Ct. 2548. If the nonmoving party meets this burden, then the motion will be denied. *Nissan Fire & Marine Ins. Co. v. Fritz Co., Inc.,* 210 F.3d 1099, 1103 (9th Cir.2000).

 Where the parties have made cross-motions for summary judgment, the Court must consider each motion on its own merits. *Fair Hous. Council of Riverside County, Inc. v. Riverside Two,* 249 F.3d 1132, 1136 (9th Cir.2001). The Court will consider each party's evidentiary showing, regardless of which motion the evidence was tendered under. *See id.* at 1137.

## B. *Judgment on the Pleadings*

■ "After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed.R.Civ.P. 12(c). A motion for judgment on the pleadings should be granted only if, "taking all the allegations in the pleading as true, the moving party is entitled to judgment as a matter of law." *McSherry v. City of Long Beach*, 423 F.3d 1015, 1021 (9th Cir.2005).

## III. *Discussion*

### A. *Intentional Interference with Contractual Relations*

■ In California, "[t]he elements ... for intentional interference with contractual relations are (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal.4th 26, 55, 77 Cal.Rptr.2d 709, 960 P.2d 513 (1998) (internal quotation marks and citation omitted). The third element incorporates a causation requirement that these intentional acts were a substantial factor in causing the breach. *See Bank of New York v. Fremont Gen. Corp.*, 523 F.3d 902, 909 (9th Cir.2008) (applying California law).

■ Unlike the related tort of intentional interference with prospective economic advantage (which is not asserted here), intentional interference with contractual relations does not require that a defendant's conduct be independently wrongful. *Quelimane Co.*, 19 Cal.4th at 55, 77 Cal. Rptr.2d 709, 960 P.2d 513 ("Because interference with an existing contract receives greater solicitude than does interference with prospective economic advantage, it is not necessary that the defendant's conduct be wrongful apart from the interference with the contract itself.")

■ Here it is only necessary to deal with the third element, pertaining to whether Nike committed intentional acts designed to induce a breach or disruption of the contractual relationship. Because even when believing all of Oakley's evidence, and drawing all *justifiable* inferences in Oakley's favor, it is clear that Nike is entitled to judgment as a matter of law on this point, and failure of proof on an essential element renders all other facts immaterial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The parties vigorously dispute the scope and requirements of California law on the issue of intentional acts, but in general the Court believes that Nike's view is correct.

*Quelimane* makes clear that liability for intentional interference "does not require that the actor's primary purpose be disruption of the contract." 19 Cal.4th at 56, 77 Cal.Rptr.2d 709, 960 P.2d 513. Instead, a claim will also be viable where the actor

> knows that the interference is certain or substantially certain to occur as a result of his action. The rule applies, in other words, to an interference that is incidental to the actor's independent purpose and desire but known to him to be a necessary consequence of his action.

> The fact that this interference with the other's contract was not desired and was purely incidental in character is, however, a factor to be considered in determining whether the interference is improper. If the actor is not acting criminally nor with fraud or violence or other means wrongful in themselves but is endeavoring to advance some interest of his own, the fact that he is aware that

he will cause interference with the plaintiff's contract may be regarded as such a minor and incidental consequence and so far removed from the defendant's objective that as against the plaintiff the interference may be found to be not improper.

*Id.* (quoting *Restatement (2d) of Torts* § 766, cmt. j) (internal quotation marks omitted). Both parties quote *Quelimane*, but disagree as to its significance. Oakley argues that, citing additional cases, "[n]othing more is required on this element" than that Nike intended to cause the result of Oakley losing McIlroy as an endorser. (Opp'n to Nike MSJ at 5, Docket No. 109.) But the cases it cites do not support that argument.

Oakley relies extensively on *Little v. Amber Hotel Co.*, 202 Cal.App.4th 280, 302, 136 Cal.Rptr.3d 97 (2011) (so long as defendant is generally aware of facts giving rise to contractual duty, "he is subject to liability even though he is mistaken as to their legal significance and believes that the agreement is not legally binding or has a different legal effect from what it is judicially held to have." (internal quotation marks and citations omitted)). But as Nike points out, the language on which Oakley relies, as well as that in the other cases Oakley cites for this proposition, is inapposite. In every case, the opinion is clearly discussing the question of whether the defendant had knowledge of the contract, which is undisputed here, and not whether the defendant had committed intentional acts designed to induce a breach. Oakley's interpretation would essentially blur the two elements into a single inquiry and eviscerate the intent requirement inherent in the tort. What the cases do suggest, as indeed Oakley argues, is that Nike would not necessarily be excused from liability merely because it mistakenly believed that Oakley was unable to match Nike's offer under the terms of Oakley's

right of first refusal agreement, provided that Nike had sufficient knowledge of the provision at all.

■ But that is not the end of the legal background necessary to decide this case, California law also provides that when information is within the knowledge of a person making a claim and not within the knowledge of the person to whom the claim is made, the latter may rely on the former's representations concerning such information. *Davis v. Nadrich*, 174 Cal. App.4th 1, 11, 94 Cal.Rptr.3d 414 (2009). In *Davis*, a partner claimed that a third party had interfered with his partnership with another by referring new matters to the other partner individually. *Id.* at 3, 94 Cal.Rptr.3d 414. The California Court of Appeal held that the third party was entitled to rely on the allegedly breaching party's representations regarding the scope of the partnership agreement. *Id.* at 10–11, 94 Cal.Rptr.3d 414 ("[Plaintiff] has not brought forth any facts to show that Nadrich was sufficiently aware of the details of the [partnership contract] to form an intent to harm it."). Thus, a party accused of intentional interference is entitled to have relied on factual representations from a person in a position to know those facts.

The Court now turns to the evidence.

It is undisputed that Nike at least said to Ridge and Hunt on numerous occasions that it did not want to sign a contract with McIlroy until McIlroy was free to enter an endorsement deal. (Banks Decl. ¶¶ 4–7, 15–16, Docket No. 94–2.) It is similarly undisputed that the representations in the Nike–McIlroy agreement providing that Nike's rights were not subject to those of any third party and that McIlroy represented that he was free to enter the agreement were a part of Nike's proffered agreement before Nike learned of Oakley's

right of first refusal. (Matterazzo Decl. ¶ 8, Docket No. 94–3.)

It is similarly undisputed that as soon as Oakley's right of refusal was mentioned on September 29, 2012, Ridge immediately stated that "they've [Oakley] told me they're not going to match and they won't match." (Schreiber Decl. Ex. 24 (Hunt Depo. Tr.) 13:17–14:6, Docket No. 109–2.) Banks then asked, "And they can't match, can they?" (*Id.* 14:11–15:24.) Ridge clarified that Oakley *had said* it would not and could not match several more times. (*Id.* 14:25–15:13.) When Hunt expressed concern about a "technicality," Ridge reiterated that Oakley would not match, mentioning a call with an Oakley executive who had, according to Ridge, said that Oakley would not exercise its right. (*Id.* 15:18–16:5.) Next, Banks stated that Nike would not make the contract subject to an Oakley right but that the issue was one for McIlroy's representatives to discuss. (*Id.* 21:14–24.) Banks and Matterazzo left the room for the matter to be decided. (21:25–22:1.) When the two returned, Ridge signed the agreement, including the covenant that McIlroy had no contractual obligations that would prevent him from entering an endorsement deal with Nike. (Matterazzo Decl. ¶¶ 12–13, Docket No. 94–3.)

Oakley makes much of the Banks's interjection asking whether Oakley even could match Nike's offer, but even drawing justifiable inferences in Oakley's favor, that statement cannot be read as urging a particular legal conclusion about a provision in a contract that Banks had not even seen, particularly coming after Ridge's clear statement, subsequently and emphatically repeated, that not only could Oakley not match, they had chosen not to do so. Regardless of whether Ridge's legal interpretation of the right of refusal was correct, or whether Nike misapprehended the legal significance of the refusal right, Ridge had represented that Oakley had already *chosen* not to exercise its matching right. Indeed, whether that statement was actually true and whether Ridge had given proper notice to Oakley of the Nike offer are issues that Oakley discusses in its briefs, but which do not affect the outcome here. What does matter is that Ridge, the only person in the room with a basis to know, made a factual (not a legal) representation that Oakley had declined to exercise its rights, and Nike had a right to rely on that representation.[3] *See Davis*, 174 Cal.App.4th at 11, 94 Cal.Rptr.3d 414. In response to Hunt's legal uncertainty, Nike's agents left the room for the Ridge and Hunt to come to a decision.

Oakley attempts to paint Nike as offering an ultimatum in the face of clear notice

**3.** At the hearing, Oakley pointed to statements in Banks's deposition transcript to argue (for the first time) that Nike did not actually rely on Ridge's representations that Oakley had decided not to match. The full context of the statements reveals that argument to be unavailing. Banks stated more than once that Ridge had represented that Oakley had declined to match and that McIlroy was free to move forward, and that Banks understood that to be the case based on those statements. (*See* Reeves Decl. Ex. 7 (Banks Depo. Tr.) 102:12–16); 104:21–25; 105:24–106:8. Oakley suggests that these statements are significant insofar as they do not indicate whether Nike relied on Ridge's representation that Oakley would not match, or on Ridge's representation (allegedly false under the Oakley–McIlroy contract) that Oakley could not match. But it is difficult to read the Banks testimony anything but favorable to Nike; Banks affirmed repeatedly that he understood from Ridge that Oakley would not match, wanted to allow McIlroy's representatives time to be certain, and then trusted that the issue was resolved when Banks and Matterazzo returned. Indeed, when they did return, Hunt, who had raised the issue of the "technicality" to begin with, offered no further objection to Ridge's signing the agreement.

that Oakley's rights were at issue. But while an award of summary judgment in Nike's favor requires believing Oakley's evidence and drawing inferences in its favor, there is simply no evidence from which a reasonable factfinder could conclude that this was an ultimatum. Oakley points to Nike's declining to make Nike's rights subject to Oakley's (Query: why should they have, given that they were told that Oakley could not and *would not* match?) and evidence that the McIlroy contract was important to Nike. But the testimony of all four participants in the September 29, 2013 negotiation confirms that Nike said nothing which Ridge or Hunt interpreted as an ultimatum.[4] Ridge ultimately signed the agreement on McIlroy's behalf, which covenanted that McIlroy was not encumbered by any other party's rights.

Given the clear evidence that Ridge, the person in a position to know, had told Nike that Oakley would not exercise its right of refusal, there is no evidence to suggest that Nike was substantially certain that any interference with Oakley's contractual rights would occur. Nike had a right to rely on Ridge's word, as indeed Oakley itself appears to do when dealing with the agents of its prospective endorsers. (*See* Reeves Decl. Ex. 15 (Bowers Depo Tr.) 520:25–523:5; *id.* Ex. 16 (Janc Depo. Tr.) 262:15–264:24, Docket No. 94–4.). In other words, even if Oakley is correct in principle that Nike's failure to comprehend the precise details of the refusal right

would not shield Nike from liability for intentional interference (though it was who Ridge had provided this allegedly false interpretation to Nike), under *Davis v. Nadrich,* Nike still had the right to rely on Ridge's representation that Oakley had chosen not to exercise its rights. As far as Nike could know at the time, Oakley had waived its rights, and McIlroy then entered a contract covenanting that he was free to do so. On the facts present here, no reasonable fact finder could conclude that Nike "form[ed] an intent to harm" the Oakley–McIlroy agreement in light of Ridge's repeated representations. *Davis,* 174 Cal.App.4th at 10–11, 94 Cal.Rptr.3d 414. Thus, Oakley has not presented a triable issue of fact regarding whether Nike committed intentional acts designed to induce a breach of contract. Summary judgment may be granted if the opposing evidence "is merely colorale ... or is not significantly probative." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Because Oakley cannot succeed on an essential element of its intentional interference claim, the Court must GRANT Nike's motion for summary judgment.[5] Oakley's cross-motion for summary judgment is consequently DENIED as moot.

## B. *Oakley's Unfair Competition and Declaratory Relief Claims*

Nowhere in its opposition to Nike's motion did Oakley oppose Nike's motion for

---

4. Oakley's evidence suggesting that the McIlroy deal was important to Nike, and that Nike executives were anxious to get it done does nothing to alter this conclusion. There is simply no evidence to contradict Nike's amply supported evidence that not only was Nike unaware of the details of the right of refusal, but also that it had been assured that Oakley had elected not to exercise such rights.

5. In its opposition to Nike's motion, Oakley claimed for the first time that Nike also interfered with Oakley's right of first refusal when it entered into the final "long-form" contract with McIlroy in April 2013. (Opp'n to Nike MSJ at 12–13, Docket No. 109.) But first, this claim was not pled. (*See* FAC, Docket No. 8.) Moreover, the Court finds that any damage to Oakley was done when the initial Nike–McIlroy contract was signed in September 2012.

judgment on the pleadings on the unfair competition and declaratory relief claims. Moreover, Oakley has stated that it "has determined not pursue [those claims ... [and] does not object to those claims being dismissed." (Opp'n to Nike MSJ at 25, n. 10, Docket No. 109.) Further, the Local Rules permit the Court deem failure to oppose as consent to the granting of the motion. L.R. 7–12. Therefore the Court GRANTS Nike's motion for judgment on the pleadings and dismisses those claims.

## IV. *Conclusion*

For the foregoing reasons, the Court GRANTS summary judgment to Nike on the intentional interference claim and GRANTS Nike's motion for judgment on the pleadings on the unfair competition and declaratory relief claims. The Court DENIES Oakley's motion for summary judgment on the intentional interference claim.

IT IS SO ORDERED.